[No. S059653. Mar. 1, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFERY JON MILLS, Defendant and Appellant.

### Counsel

James M. Fahey and Ezra Hendon, under appointments by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Harry J. Colombo and Paul A. Bernardino, Deputy Attorneys General, for Plaintiff and Respondent.

### Opinion

**WERDEGAR, J.**—A Sacramento County jury convicted Jeffery Jon Mills in 1996 of the first degree murder of Sherri Farrar. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) It also convicted defendant of three forcible sex crimes, all involving the murder victim: rape, sodomy, and sexual penetration. (§§ 261, subd. (a)(2), 286, subd. (c), 289, subd. (a).) The jury sustained special circumstance allegations that defendant murdered Farrar while engaged in the commission of the crimes of rape, sodomy, and sexual penetration. (§ 190.2, subd. (a)(17)(C), (D) & (K).) As to each count, the jury also sustained allegations that defendant personally used a deadly weapon, to wit, a knife. (§§ 12022, subd. (b), 12022.3, subd. (a).) On December 30, 1996, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).) As we explain, we affirm the judgment.

## I. GUILT PHASE

### A. *Facts*

Eric Thomas and victim Sherri Farrar were a young couple living in the Sacramento area. They had a young son, who was born in 1992. On February 10, 1994, they wished to go out, and arranged to have their friend, Nancy Warner, babysit their son. After dropping him off at Warner's house, they went to the Sierra Inn, where they played pool and shared a pitcher of beer. They later went to the Pine Lodge, where they each had one mixed drink before returning to Warner's house. On the way there, they picked up some beer and a pizza, arriving at Warner's house around 10:30 p.m. Farrar appeared to have glassy eyes but was not obviously drunk. Farrar and Warner stayed in the kitchen drinking coffee while Thomas and Warner's boyfriend drank beer and ate the pizza in the living room.

Thomas was ready to leave around 11:00 p.m., as he had to be at work at 7:00 the next morning. Farrar apparently was not ready to leave and they

argued, but they eventually left Warner's house around 11:30 p.m. with Farrar driving. During the drive home, Farrar admired the starry sky and accidentally allowed the car to swerve onto the shoulder. Thomas yelled at her and an argument ensued. Past hurtful incidents were recalled, escalating the argument. Farrar eventually stopped the car, grabbed her jacket and purse, and got out. Thomas tried to convince her to return, but she refused and walked away, saying: "[N]o, forget it."

By this time it was past midnight. Thomas walked around and tried to find Farrar but was unsuccessful. She was apparently not going to return that evening; Thomas described her as a very stubborn person. He could recall at least six other times an argument had caused her to abandon the car in this fashion, but she always came home after she had cooled off. He also recalled four incidents in which she had hitchhiked. He assumed Farrar would walk to International Billing Services (IBS), a warehouse business where she had previously worked. IBS was open 24 hours a day and was approximately five miles away from where Farrar had gotten out of the car. Four members of her family worked at IBS, and she also had family members who lived in the area. In the meantime, Thomas was in a quandary. Their young son was in the car, and Thomas had to get him home. Thomas also knew he had had a lot to drink and was worried about driving himself, as he had past arrests for drunk driving. He eventually decided to drive home and wait for Farrar. He arrived home without mishap, put his son to bed, and waited for Farrar on the couch in the living room. He eventually fell asleep. Farrar had not returned by morning, however, and Thomas was worried.

Thomas's surmise about the direction Farrar would take was correct. A cashier at a gas station near where Farrar had gotten out of her car recalled seeing her around 12:15 a.m. She walked from the direction of the public telephones and bought cigarettes, candy, and a lighter. He described her as "maybe a little slightly drunk," but happy and walking without difficulty. She headed off on foot in the direction of IBS. Rebecca Rommel, Farrar's grandmother who had raised her, was working the night shift at IBS that night.

Defendant worked at IBS as a warehouseman. On the night of the crimes, he was out with fellow IBS employee George Solorzano and his girlfriend, drinking and shooting pool. Defendant liked to drink bottles of Miller Genuine Draft beer. They agreed that defendant would spend the night at Solorzano's house in the Placerville area so they could carpool to work the next morning. Sometime between 11:00 p.m. and 1:00 a.m., they left for Solorzano's home in separate cars. Defendant, driving a red car with gray primer paint on it, followed Solorzano for a bit but turned off the highway and never arrived at Solorzano's house. He did not show up for work the next day, and calls to his home were not answered.

Sharon Fulton, an IBS warehouse supervisor, was working that night. She knew that defendant had worked the day shift and gotten off work at 5:00 p.m., so she was surprised to see him at the warehouse around midnight that night. He was still wearing his blue IBS work shirt and appeared intoxicated. Kathy Glaneman, defendant's mother, was also working at the IBS warehouse that night and saw defendant around midnight. Defendant lived with Glaneman, and because it was payday she asked for his share of the rent. He gave her $600 and then left.

Between 5:45 and 6:45 the next morning, several people driving to work along White Rock Road reported seeing a red car on the side of the road. Some drivers noticed the car also bore gray primer paint. Two reported seeing a man who looked like defendant. Others reported seeing a White man in a blue shirt with a logo on it. Two reported seeing the body of someone lying on the ground near the man.

Police investigated and discovered the lifeless body of Sherri Farrar along White Rock Road about 3.7 miles from the IBS warehouse. She was naked and her throat had been cut. Police found a Miller Genuine Draft beer bottle between her buttocks. The bottle bore defendant's thumbprint and had feces around the rim. His fingerprints were also found on other items at the crime scene. A pathologist later estimated Farrar had been killed between 3:00 and 7:00 a.m. A massive wound to her throat caused her death from loss of blood and was probably caused by six to 12 slashes from a blade. Detective Bell testified that police later found box cutters and knives in defendant's car and bedroom; Dr. Robert Anthony, a forensic pathologist, testified any of these items could have caused the fatal wound, although none had any blood on them. In addition to the obvious injury to her throat, the victim also bore other, lesser injuries, including bruising on her knee and hand, two postmortem stab wounds on her left breast, multiple superficial cuts inflicted before death that were probably caused by a knife tip, and a blow to her temple that could have caused unconsciousness. Mary Hansen, a criminalist, found evidence of semen on vaginal and rectal swabs. A DNA analysis found the semen was consistent with defendant's blood, and the chance the semen would match another Caucasian was only one in 12 billion. Thomas testified he had not had intercourse with Farrar for four or five days.

Defendant called in sick and did not go to work on Friday. His mother, Glaneman, saw him at home that day working on his car. Defendant returned to work on Saturday, February 12, 1994, and spent that night at his friend John Selby's home. The next day (Sunday), defendant, Selby, and Selby's girlfriend Susan Lee went sightseeing in San Francisco and stayed the night in the city. On Monday, the three of them, along with Lee's sister, went snowboarding at Donner Ranch. Police arrested defendant the following day, Tuesday.

Police impounded defendant's car, and a police investigation revealed that fibers found on the victim matched the carpet in the car. Tiny spots of blood in the car were consistent with the victim's blood and inconsistent with defendant's. In an interview with police, defendant denied being on White Rock Road on the night in question or that he was the man witnesses saw there. On the night the victim was killed, he claimed he spent the night sleeping in his car, which he parked in front of a Motel 6 in the Placerville area. Police determined no such motel exists in that area.

At trial, defendant testified in his own defense and told a different story. He admitted he had lied to police when interviewed, claiming he was scared. He testified he saw the victim on the night in question around 1:30 a.m. She was hitchhiking, and he picked her up. According to defendant, she asked if he wanted to play pool; when he agreed, she directed him to a bar he was unfamiliar with. He first stopped at a liquor store and bought 12 bottles of Miller Genuine Draft beer because, at that hour, no establishment would be serving alcohol. He could not, however, recall either the name or the location of the bar or the liquor store. He stopped at a pay phone at 1:30 a.m. and called in sick for the next day. (The parties stipulated that defendant's foreman would testify that he had received a message from defendant calling in sick around that time.)

Defendant claimed that he and Farrar eventually left the bar and went searching for a party. Finding none, he stopped his car on White Rock Road, where he claimed they engaged in consensual sex. After he ejaculated, he claimed he looked down at her buttocks and remarked, "[D]amn, you're thick." He said he meant the remark as a compliment, but the comment angered her. According to defendant, Farrar, while standing by the side of the road with her pants around her ankles, began arguing with defendant, eventually telling him: "Fuck you, I got AIDS." At this, defendant said he "just exploded and I jumped at her." He testified he pulled out the Swiss Army knife he kept on his keychain, unfolded the blade, and twice stabbed her in the chest before cutting her throat. When he realized what he had done, he noticed cars were driving by so he fled in his car. He almost immediately had a change of heart and made a U-turn on White Rock Road, returning to the scene. Farrar was not moving. He turned her onto her stomach and, becoming angry, shoved a bottle in her rectum. He fled the scene a second time, this time with Farrar's jacket and purse. He told the jury he later discarded these items, as well as the rest of the beer bottles, his bloody clothes, and his Swiss Army knife. He went home, showered, and then spent the day washing and vacuuming his car. He admitted going to San Francisco that Sunday with John Selby and his girlfriend and then snowboarding the day after that.

Defendant admitted suffering prior convictions for auto theft, false personation, possession of marijuana, and residential burglary.

### B. *Pretrial Issues*

#### 1. *Failure to Instruct Prospective Jurors on Their Civic Duty*

Prior to trial, defendant moved to have the prospective jurors instructed that unless they were unable to do so, it was their civic duty to set aside any personal scruples they might have against the death penalty. In support, he cited the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as article I, sections 1, 7, 13, 15, 16, 17, and 27 of the California Constitution. The prosecutor opposed the motion, arguing no such requirement exists, but stated at the hearing he had no objection to the type of instruction typically given to jurors in noncapital cases regarding their civic duty to serve. At that same hearing, defense counsel explained more precisely the type of instruction he desired: "[W]hat we are suggesting is that simply because a juror says I don't believe that I could sentence anyone to death, that that should not be an automatic exclusion. So, we believe the Court should explain to the jurors that they should approach this as they would in any case with the inclusion of the fact that they will at some point have to decide the penalty to be imposed in this case should we reach that point. [¶] And what we are asking the Court to do and it may mean that we need to formulate some type of a proposed procedure, that we want the Court to explain to the [jurors] that they have a civic duty and an obligation to sit on a jury and that we should not just allow them to say I can't vote [for] death or I will vote [for] death in every case without an explanation of what their responsibilities are."

The trial court denied the motion but did so expressly without prejudice, explaining that if defense counsel would prepare in written form "what you wish me to represent to the jury regarding their civic responsibilities, *I would be glad to consider that* and that would give the People the opportunity to review it as well as the Court." (Italics added.) Defense counsel indicated he understood the court's ruling, but although he subsequently filed many written motions, he apparently elected not to submit any further written briefing on the matter despite the opportunity to do so. Both sides later agreed to the introductory remarks the trial court would deliver to the prospective jurors. On at least two occasions during the voir dire proceedings, the trial court instructed the prospective jurors generally about their civic obligation to serve as jurors "in cases such as this one" but did not include in that instruction any specific mention of the death penalty. Defendant did not object on either occasion.

Defendant now contends the trial court erred prejudicially when it failed to instruct the prospective jurors regarding their civic duty to serve as jurors in a death penalty case. We reject the argument at the threshold for it was not preserved for appellate review. As a general matter, when a trial court denies a motion without prejudice the matter is forfeited if not renewed. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1124 [63 Cal.Rptr.3d 297, 163 P.3d 4] [change of venue motion].) In any event, because the trial court explained to defense counsel that it was denying the motion *without prejudice* and would consider the matter should counsel file additional written argument, the court was entitled to assume that in the absence of any renewed briefing, counsel had abandoned the motion. This assumption would have been confirmed when counsel made no later objection. A party must make a timely and specific objection to the manner in which a trial court conducts jury selection or the matter is forfeited for appeal. (*People v. Holt* (1997) 15 Cal.4th 619, 656–657 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

■ Even assuming for argument the issue were properly before us, it would be meritless. In *People v. Hamilton* (1989) 48 Cal.3d 1142 [259 Cal.Rptr. 701, 774 P.2d 730], the defendant made the precise argument defendant now raises, claiming that "before excluding venirepersons on the basis of their death penalty views, the trial court should have instructed sua sponte that they had a 'civic duty' to subordinate their personal views to the law and their oaths." (*Id.* at p. 1166, fn. 15.) We rejected the argument, explaining that "no case has imposed the obligation of a sua sponte instruction to that effect, and we decline to impose one here." (*Ibid.*) As defendant recognizes, we have affirmed *Hamilton*'s conclusion, and declined to revise or revisit it, several times in the intervening years. (See, e.g., *People v. Hoyos* (2007) 41 Cal.4th 872, 908 [63 Cal.Rptr.3d 1, 162 P.3d 528]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1261 [270 Cal.Rptr. 451, 792 P.2d 251].) Defendant nevertheless argues our previous holdings were erroneous for failing to provide sufficient content to his federal constitutional rights to an impartial jury, due process, equal protection, and a reliable penalty determination. It is difficult to imagine what additional protection would be derived from the proposed jury instruction, given the extensive vetting of prospective jurors and their views regarding the death penalty by use of a jury questionnaire and in-court oral voir dire according to the standards set forth in *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. Accordingly, we reject the argument.

### 2. *Denial of Motion to Prevent Death Qualification of the Jury or for Separate Juries*

Prior to trial, defendant moved to prevent the trial court from excluding prospective jurors who could not remain impartial regarding imposition of the

death penalty (a process known as "death qualification") or, in the alternative, for the empanelment of separate juries to try the guilt and penalty phases of the trial. In support, he claimed the death qualification process violated his federal and state constitutional and statutory rights to a fair and impartial trial and a jury drawn from a cross-section of the community because it impermissibly produced a jury substantially more likely to convict at the guilt phase, i.e., a so-called guilt-prone jury. The prosecutor opposed the motion, and the trial court denied it.

Defendant recognizes that the process of juror "death qualification"— the removal from the venire of all prospective jurors who would automatically vote either for life imprisonment or for death, irrespective of the facts of the individual case—has long been a part of capital trials in California. (*Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].) He argues, however, that the continuing legitimacy of *Hovey* and its legal progeny depends on the absence of any social science evidence that the relative number of those jurors who would invariably vote for death (what *Hovey* called the " 'automatic death penalty' group" (*id.* at p. 20, fn. 48)) was insignificant compared to the number who would always vote for life. This is so, he argues, because (1) *Hovey* itself opined that "the use of a 'death-qualified' jury pool to select a guilt phase jury would be unconstitutional if juries so selected would tend to return more verdicts favorable to the prosecution than would juries selected from a 'neutral' jury pool" (*id.* at p. 22, fn. 54); (2) *Hovey*'s result depended on its observation that existing studies were flawed because they surveyed juries that included jurors—ineligible in California—who would automatically vote for the death penalty if a defendant was convicted of murder (the so-called automatic death penalty group) (*id.* at p. 63); and (3) those flawed studies could not be rehabilitated by simply subtracting the jurors in the automatic death penalty group because, although the *Hovey* defendant had argued the number of jurors in that group was inordinately small compared to those in the automatic life group, "there is no reliable evidence in the record to support [the defendant's] assumption as to the minute size of the 'automatic death penalty' group. The defense experts below repeatedly admitted that 'nobody knows' the size of this group." (*Id.* at p. 64.)

While acknowledging there was a sparse record in *Hovey v. Superior Court, supra,* 28 Cal.3d 1, concerning the number of jurors holding particular death penalty views, defendant claims that advances in social science since *Hovey* have demonstrated that the number of jurors in the automatic death penalty group "are less than 10% as numerous as jurors excludable by virtue of unbending opposition to the death penalty." This statistic, he contends, undermines the efficacy of *Hovey*'s endorsement of the death qualification process. (See generally Kadane, *Juries Hearing Death Penalty Cases: Statistical Analysis of a Legal Procedure* (1983) 78 J. American Statistical Assn. 544;

Kadane, *After Hovey: A Note on Taking Account of the Automatic Death Penalty Jurors* (1984) 8 Law & Hum. Behav. 115.)

The *Hovey* court's concerns about the state of the statistical evidence have been superseded by subsequent decisions finding "[t]he exclusion of those categorically opposed to the death penalty at the guilt phase of the trial does not offend either the United States Constitution (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 176–177 [90 L.Ed.2d 137, 106 S.Ct. 1758]) or the California Constitution (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 956–957 [2 Cal.Rptr.2d 112, 820 P.2d 214]). As the United States Supreme Court explained, death penalty opponents, 'or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement.' (*Lockhart, supra,* 476 U.S. at pp. 176–177 . . . ; see also *People* v. *Fields* (1983) 35 Cal.3d 329, 353 [197 Cal.Rptr. 803, 673 P.2d 680].) It is also well settled that this exclusion does not violate defendant's right to an impartial jury. (*Lockhart, supra,* 476 U.S. at pp. 183–184 . . . ; *Ashmus, supra,* 54 Cal.3d at p. 957.) [¶] Thus *even if it were true,* as defendant argues extensively, *that social science evidence now shows conclusively that death-qualified juries are more prone to convict than those not thus qualified,* that evidence does not support a constitutional prohibition of such death qualification. (*Lockhart* v. *McCree, supra,* 476 U.S. at p. 173 . . . .) His claim is therefore without merit." (*People* v. *Jackson* (1996) 13 Cal.4th 1164, 1198–1199 [56 Cal.Rptr.2d 49, 920 P.2d 1254], italics added.)[1]

We have recently reaffirmed this position, explaining: "This court and the United States Supreme Court have repeatedly rejected the claim that separate juries are required because jurors who survive the jury selection process in death penalty cases are more likely to convict a defendant. [Citations.] Defendant here has provided no compelling reason for us to deviate from these holdings." (*People* v. *Davis* (2009) 46 Cal.4th 539, 626 [94 Cal.Rptr.3d 322, 208 P.3d 78]; see also *People* v. *Richardson* (2008) 43 Cal.4th 959, 987 [77 Cal.Rptr.3d 163, 183 P.3d 1146].)

Defendant's further contention that he was, in the alternative, entitled to a separate jury to try his penalty phase is similarly meritless. "Section 190.4, subdivision (c), expresses the Legislature's long-standing preference for a single jury to decide both guilt and penalty, and this preference does not

---

[1] We note the dissenters in *Lockhart v. McCree* referenced the exact social science publication to which defendant cites. (*Lockhart v. McCree, supra,* 476 U.S. at p. 187, fn. 2 (dis. opn. of Marshall, J., joined by Brennan and Stevens, JJ.).) Accordingly, we infer that the majority in *Lockhart* found it as unpersuasive as we do today.

violate a capital defendant's federal or state rights to due process, to an impartial jury, or to a reliable death judgment." (*People v. Davis*, *supra*, 46 Cal.4th at p. 626.)

### 3. *Alleged* Batson/Wheeler *Error*

■ Defendant contends the prosecutor violated his state and federal constitutional rights by exercising his peremptory challenges to excuse six prospective jurors because they were African-American. (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*), overruled in part in *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410]; *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).)[2] " 'In [*Wheeler*] . . . we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in [*Batson*] . . . the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

The law applicable to *Wheeler/Batson* claims is by now familiar. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California*, *supra*, 545 U.S. at p. 168, fn. omitted.)

In this case, defense counsel moved to quash the jury venire, citing *Wheeler*, *supra*, 22 Cal.3d 258, later adding his reliance on *Batson*, *supra*, 476 U.S. 79, as well, and citing both the state and federal Constitutions. After inviting the prosecutor to volunteer his reasons for exercising peremptory challenges against the six identified prospective jurors and hearing argument from both sides, the trial court denied defendant's motion, stating: "[I]n terms of the

---

[2] That both defendant and the victim are White does not defeat his *Wheeler/Batson* claim. "The defendant need not be of the same race to object to a prosecutor's race-based exercise of peremptory challenges. (*Powers v. Ohio* (1991) 499 U.S. 400, 415–416 [113 L.Ed.2d 411, 111 S.Ct. 1364].)" (*People v. Burgener* (2003) 29 Cal.4th 833, 863 [129 Cal.Rptr.2d 747, 62 P.3d 1].)

prima faci[e] case, I'm satisfied that the defense has not made a prima faci[e] case. [¶] For [the] sake of argument, had they made such a prima faci[e] case, I am satisfied that from the jury questionnaires of the African-American jurors who were questioned, from their voir dire and also from the explanation given by the prosecutor, that their exclusion was occasioned by valid trial reasons based on factors other than race."

As the preceding passage makes clear, the trial court ruled that defendant failed to make a prima facie showing of group bias (the first stage of a *Batson* inquiry), and also passed judgment on the prosecutor's actual reasons for the peremptory challenges (the third stage of a *Batson* inquiry), expressly noting that the court was "satisfied . . . from the explanation given by the prosecutor" that the motivation for the challenges was not based on race.[3]

This case is thus a first stage/third stage *Batson* hybrid. As we have both the prosecutor's actual reasons and the trial court's evaluation of those reasons, this case is similar to *People v. Lenix* (2008) 44 Cal.4th 602 [80 Cal.Rptr.3d 98, 187 P.3d 946] (*Lenix*), where "the trial court requested the prosecutor's reasons for the peremptory challenges and ruled on the ultimate question of intentional discrimination. Thus, the question of whether defendant established a prima facie case is moot." (*Id.* at p. 613, fn. 8.) Accordingly, we express no opinion on whether defense counsel established a prima facie case of discrimination and instead skip to *Batson*'s third stage to evaluate the prosecutor's reasons for dismissing six African-American prospective jurors.[4]

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to

---

[3] The case bears a superficial resemblance to *People v. Hawthorne* (2009) 46 Cal.4th 67, 78–80 [92 Cal.Rptr.3d 330, 205 P.3d 245], in which the trial court similarly found no prima facie case of group bias, but the prosecutor also gave her reasons for exercising her peremptory challenges. But *Hawthorne* is distinguishable because the trial court here expressly considered and accepted the prosecutor's reasons, finding no evidence of racial bias, whereas the trial court in *Hawthorne* did not, but merely allowed the prosecutor to state her reasons on the record without passing judgment on those reasons.

[4] Defendant emphasizes that the prosecutor excused all four African-American prospective jurors who made it into the box and both African-American alternate jurors who made it into the box, and that no African-Americans remained on the jury. This argument is more relevant to whether defendant has demonstrated a prima facie case and is of lesser importance when evaluating whether the prosecutor's stated reasons were pretextual. Nevertheless, by skipping to *Batson*'s third stage and evaluating the prosecutor's reasons for exercising his peremptory challenges, we do not mean to suggest the statistical numbers cut in any way other than in defendant's favor. (See, e.g., *Snyder v. Louisiana* (2008) 552 U.S. 472, 476 [170 L.Ed.2d 175, 128 S.Ct. 1203] ["[A]ll 5 of the prospective black jurors were eliminated by the prosecution through the use of peremptory strikes."]; *Miller-El v. Dretke* (2005) 545 U.S. 231, 240–241 [162 L.Ed.2d 196, 125 S.Ct. 2317] [nine of 10 remaining Black jurors were "peremptorily struck by the prosecution"].)

be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.] [¶] Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] *So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.* [Citation.]' " (*Lenix, supra,* 44 Cal.4th at pp. 613–614, fn. omitted, italics added.)

At the threshold, we find the parameters of defendant's contention to be unclear. He argues, "there were six African-American prospective jurors in this case, 100% of whom made it 'into the box' and 100% of whom were [challenged by the prosecutor]." As respondent argues and the record shows, however, there were 13, not six, prospective jurors who were African-American. We take defendant's argument, then, to be that the prosecutor challenged all six African-Americans who were at one time or another seated in the box. When the trial court suggested counsel's motion was based on the fact the prosecutor had exercised peremptory challenges against *four* African-American prospective jurors, however, counsel did not disagree. Later, counsel stated it was his "understanding that once I make the showing that *all* of the black African-American prospective jurors were dismissed peremptorily by the People, then they have to [justify their actions]." We assume defendant intends to challenge the prosecutor's decision to strike four African-Americans from the regular jury and two from the alternates, or six prospective jurors in all.

Before turning to an examination of the six prospective jurors defendant identifies, we address and reject two threshold arguments he raised in his supplemental brief. First, he argues we should not defer to the trial court's credibility determinations because the court did not rely expressly on an assessment of the demeanor of the jurors and the prosecutor. (*Lenix, supra,* 44 Cal.4th at p. 614; *People v. Jackson, supra,* 13 Cal.4th at pp. 1197–1198.) But although such reliance was not express, the court unquestionably weighed the credibility of the prospective jurors and the prosecutor when it denied the *Wheeler/Batson* motion after stating it had considered the voir dire of the

African-American prospective jurors as well as "the explanation[s] given by the prosecutor." Deference is thus appropriate " '[s]o long as the trial court [made] a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered . . . .' " (*Lenix*, at p. 614.)

■ Second, defendant contends the prosecutor, in explaining his peremptory challenges, relied almost exclusively on the prospective jurors' written answers on their questionnaires. Although we have recently explained that excusing a prospective juror in a capital case *for cause* by relying solely on the juror's written answers to a questionnaire is permissible, so long as it is clear from those written answers that the juror is unable or unwilling to set aside his or her personal beliefs and follow the law (*People v. Wilson* (2008) 44 Cal.4th 758, 787 [80 Cal.Rptr.3d 211, 187 P.3d 1041]; *People v. Avila* (2006) 38 Cal.4th 491, 531 [43 Cal.Rptr.3d 1, 133 P.3d 1076]), the same restriction does not apply to peremptory challenges. A party's justification for exercising a peremptory challenge " 'need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*Lenix, supra*, 44 Cal.4th at p. 613.)

■ We turn now to an examination of the circumstances in which the prosecutor excused the six African-American prospective jurors identified by defendant. As we explain below, the trial court considered and evaluated the merits of the prosecutor's stated reasons for excusing these jurors, finding each peremptory challenge was supported by a permissible motive. Applying the appropriate deferential standard of review, we conclude substantial evidence supports the trial court's assessment of the prosecutor's stated reasons. (*Lenix, supra*, 44 Cal.4th at pp. 613–614.)

a. *Prospective Juror K.B.*

Addressing the reason he chose to exercise a peremptory challenge against Prospective Juror K.B., the prosecutor explained he challenged her "primarily" because she was undecided about the death penalty, stating: "[I]t is a difficult case and I need people that have some thoughts already on the subject and are strong in that area." In addition, he was concerned K.B. had indicated in her jury questionnaire that, in murder cases, the prosecution should bear a higher burden of proof. The trial court accepted both reasons. If supported by substantial evidence, either reason can serve adequately as a race-neutral reason to excuse a juror with a peremptory challenge. (*People v. Smith* (2005) 35 Cal.4th 334, 347–348 [25 Cal.Rptr.3d 554, 107 P.3d 229] [a prospective juror's doubts about the death penalty can be a legitimate, race-neutral reason to exercise a peremptory challenge]; *People v. Catlin*,

*supra*, 26 Cal.4th at pp. 116, 118 [same]; *People v. Kelly* (2008) 162 Cal.App.4th 797, 805, fn. 10 [76 Cal.Rptr.3d 316] [proper to excuse a juror when it appeared the juror " 'did not understand the concept of burden of proof' "]; *People v. Rodriguez* (1999) 76 Cal.App.4th 1093, 1114 [91 Cal.Rptr.2d 308] [juror successfully "challenged based on her difficulty in understanding the burden of proof"].)[5]

 Defendant argues the prosecutor's reasons for excusing Prospective Juror K.B. were pretextual, that he instead excused her because of racial bias, and that we may infer as much because the prosecutor left unchallenged other, non-African-American prospective jurors who had expressed sentiments similar to K.B.'s. In short, he urges us to conduct a comparative juror analysis. We have recently explained that "[c]omparative juror analysis is a form of circumstantial evidence" (*Lenix, supra*, 44 Cal.4th at p. 627) courts can use to determine the legitimacy of a party's explanation for exercising a peremptory challenge, although such evidence may not alone be determinative of that question (*id.* at p. 626), can be misleading, especially when not raised at trial (*id.* at p. 620), and has inherent limitations given the "[m]yriad subtle nuances" of a person's demeanor that might communicate meaning to an attorney considering a challenge (*id.* at p. 622). With those caveats in mind, we examine defendant's arguments.

The prosecutor indicated Prospective Juror K.B.'s views about the death penalty were the main reason he challenged her. Defendant argues Jurors Nos. 7, 8, and 11—all of whom are White—gave "identical or very similar answer[s]" to those given by K.B. In particular, defendant relies on the answers given by K.B. and the three White jurors to questions Nos. 88, 88a, and 89, which sought to elicit prospective jurors' views about the death penalty. After a long preface explaining the penalty phase procedures, question No. 88 asked prospective jurors to "[b]riefly describe your opinions about the death penalty." The four jurors defendant asks us to compare answered question No. 88 this way:

| K.B. | — | "No opinion." |
| Juror No. 7 | — | "I have no opinion." |
| Juror No. 8 | — | "It may be a necessary punishment in some murder cases." |
| Juror No. 11 | — | "Haven't thought about it much at all." |

K.B.'s answers and those of Jurors Nos. 7 and 11 appear similar. Arguably Juror No. 8's answer shows somewhat more support for the death penalty.

---

[5] That K.B. agreed she could follow the applicable standard of proof when the trial court explained it to her does not, as defendant argues, strongly undermine the prosecutor's reliance on this circumstance. In any event, she was hesitant and equivocal even after the law was explained to her, providing sufficient support for the prosecutor's concern.

Question No. 88a asked whether the prospective juror believes the death penalty is imposed "Too often," "Not often enough," or "About right," and then asks the juror to explain his or her answer. The four jurors defendant asks us to compare answered question No. 88a this way:

K.B. — She did not check anything and explained: "Don't know."

Juror No. 7 — She checked "About right," but did not provide an explanation.

Juror No. 8 — He did not check anything and explained: "I've never sat on a jury and can't really answer that."

Juror No. 11 — She did not check anything and explained: "I don't really know. I don't follow cases enough to answer this."

It is difficult to discern much of a difference between these answers. If anything, Juror No. 7's answer showed a more developed understanding of the death penalty.

Finally, question No. 89 asked prospective jurors to explain: "What purpose do you think the death penalty serves?" The four jurors defendant asks us to compare answered question No. 89 this way:

K.B. — "Don't know how decided on exact reasoning (based on the law) [sic]."

Juror No. 7 — "Not sure, NEVER thought much about it."

Juror No. 8 — "Hopefully as a deterrent to others who would commit terrible crimes."

Juror No. 11 — "It kills."

The answers of K.B. and Juror No. 7 appear similar. Arguably the answers of Jurors Nos. 8 and 11 show somewhat more support for the death penalty.

From this data, defendant argues that "on every one of these [death penalty related] questions, there are one or more non African-American jurors who had one identical or very similar answer in common with [Prospective Juror K.B.]" Were this the only evidence in the record regarding the death penalty views of these four prospective jurors, defendant might have a plausible case, although the vague answers make it difficult to reach any firm conclusions. As respondent points out, however, there was additional evidence from which the prosecutor could reasonably distinguish between K.B. and Jurors Nos. 7, 8, and 11, based on their views concerning capital punishment. For example, question No. 90a asked: "In what type of cases, if

any, do you think the death penalty should be imposed?" The four jurors defendant asks us to compare answered question No. 90a this way:

| | | |
|---|---|---|
| K.B. | — | "I don't know." |
| Juror No. 7 | — | "Very violent crimes." |
| Juror No. 8 | — | "That's not my decision—the judge should tell the jury if the defendant is found guilty." |
| Juror No. 11 | — | "Homicide." |

The answers of Jurors Nos. 7, 8, and 11 evince a more developed understanding of capital punishment. K.B., on the other hand, appears more equivocal about the death penalty, a view further supported by an examination of question No. 90b, which asked: "In what type of cases do you think the death penalty should *not* be imposed?" (Italics added.) The four jurors defendant asks us to compare answered question No. 90b this way:

| | | |
|---|---|---|
| K.B. | — | "I'm not sure." |
| Juror No. 7 | — | "DUIs, petty crimes." |
| Juror No. 8 | — | "See 90a [i.e., it is not his decision]." |
| Juror No. 11 | — | "Robbery." |

The answers of Jurors Nos. 7, 8, and 11 thus evince a more developed understanding of capital punishment as compared to K.B., who was noncommittal in response to both questions Nos. 90a and 90b.

This difference in views concerning capital punishment between Jurors Nos. 7, 8, and 11, on the one hand, and Prospective Juror K.B., on the other, is drawn more sharply if we examine the oral voir dire. When asked about her views on the death penalty, K.B. stated she had no opinion even after filling out the questionnaire. When asked whether she could vote for the death penalty, she replied: "Yes, I think I can."

By contrast, Juror No. 7 stated on voir dire that she had thought about capital punishment since completing the questionnaire and that her new opinion was that the appropriateness of a sentence of death or life without the possibility of parole would depend on the circumstances. She said she was open-minded on the issue of sentencing and would consider both options. Similarly, after Juror No. 8 was told that the jury, not the judge, would decide the punishment, he was asked: "Do you feel that based on your life experiences and your philosophy that you could actually personally vote for the death penalty if you felt it was the just punishment?" He stated simply, "Yes." Juror No. 11, like K.B., had no strong opinion about the death penalty and would consider both penalties.

As shown by a more complete comparison of these four prospective jurors, differences on the subject of capital punishment—and their relative willingness to impose it—existed among them. On this record, the prosecutor could thus have distinguished between K.B., on the one hand, and Jurors Nos. 7, 8, and 11, on the other. Or more precisely, sufficient differences are apparent in the record such that we cannot conclude the trial court failed to make a " 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered' " by the prosecutor. (*Lenix, supra,* 44 Cal.4th at p. 614.) Accordingly, that we defer to the trial court's decision to accept the prosecutor's explanation that he challenged K.B. primarily because of her views about the death penalty is appropriate.

The prosecutor opined that he challenged K.B. also because she had indicated she would hold him to a higher standard of proof. Defendant contends this too was a sham excuse that hid a racial motive and argues that Juror No. 10, who is Hispanic, and Juror No. 12, who is White—both of whom served on the jury—reported the same sentiment on their respective questionnaires but the prosecutor did not challenge them. The prosecutor did not address this point at trial, but a review of the record reveals that neither juror was comparable to K.B. Juror No. 10 did not indicate she would definitely hold the prosecutor to a higher standard, but instead wrote, "I don't know," suggesting a reduced level of concern. Moreover, the prosecutor candidly explained that Juror No. 10 had been on his list of prospective jurors he intended to challenge, but a more objectionable prospective juror was up next so he decided to pass on challenging Juror No. 10. As we observed in *Lenix,* "the selection of a jury is a fluid process, with challenges for cause and peremptory strikes continually changing the composition of the jury before it is finally empanelled." (*Lenix, supra,* 44 Cal.4th at p. 623.) Similarly, although Juror No. 12 checked the box on his questionnaire to indicate he would hold the prosecutor to a higher standard and even added, "I would rather see a guilty man go free than an innocent man wrongly found guilty," the prosecutor might well have been less concerned about this point because Juror No. 12 was a correctional officer and thus could have been perceived by the prosecutor as more likely to be sympathetic to the prosecution. (Cf. *People v. Gonzalez* (1989) 211 Cal.App.3d 1186, 1194 [259 Cal.Rptr. 870] [defense counsel excused a prospective juror by peremptory challenge "because she was a guard at a correctional facility . . ."].)

In his supplemental brief, defendant argues for a more extensive comparison of jurors on this point. He contends that because a juror's belief that the prosecution should be held to a higher burden of proof is indicative of a prodefense bias, and because the prosecutor passed on other jurors—White jurors—who revealed a similar prodefense bias, we should conclude the prosecutor's professed concern about K.B. was disingenuous and pretextual. In particular, he cites Jurors Nos. 5, 8, 9, and 12, along with Alternate Jurors

Nos. 2 and 3, all of whom expressed some degree of a prodefense bias when responding to various questions in the questionnaire. As respondent argues, however, "the prosecutor never stated that he was only looking [to excuse all jurors who had] a 'pro-defense' bias. Rather the prosecutor stated that he was searching for a juror who had the combination of a defined understanding of capital punishment and a personal capability to vote for the death penalty, under the standard burden of proof based on a sincere interest and familiarity with the criminal justice system." That other jurors expressed some degree of a prodefense bias when answering other questions on the questionnaire thus does not undermine the prosecutor's explanation that he challenged K.B. in part because she indicated on her questionnaire that she would hold the prosecutor to a higher burden of proof than is required by law.

Considering the totality of the circumstances, we conclude the trial court's acceptance of the prosecutor's explanation for challenging Prospective Juror K.B., and the implicit credibility determination that necessarily underlay that acceptance, is supported by substantial evidence and thus entitled to deference. (*Lenix, supra*, 44 Cal.4th at pp. 613–614.)

### b. *Prospective Juror A.M.*

Defendant also challenges the trial court's acceptance of the prosecutor's explanation for why he challenged Prospective Juror A.M. Regarding A.M., the prosecutor explained that he challenged her primarily because she believed use of "the death penalty should be extremely rare." This is borne out by her jury questionnaire, in which she wrote: "I think that there are circumstances in which the death penalty is necessary but I also think it's use should be *extremely rare*." (Italics added.) Defendant argues this reason was insincere and probably masked a racial bias because the prosecutor failed to challenge Jurors Nos. 7, 8, and 11, all of whom are White and all of whom expressed uncertainty about capital punishment. But none of the other jurors expressed the level of A.M.'s certainty that the death penalty should be "extremely rare." For example, in response to the same question, Juror No. 7 replied that she had "no opinion." Juror No. 8 responded by stating: "It may be a necessary punishment in some murder cases." And Juror No. 11 replied: "I hadn't thought about it much at all." As these responses indicate, the answers given by Jurors Nos. 7, 8, and 11 did not evince the same degree of clarity and forthrightness as did A.M.'s that imposition of the death penalty should be "extremely rare."

Defendant argues the prosecutor's reliance on A.M.'s views regarding the applicability of the death penalty is inconsistent with his failure to challenge Juror No. 10 and Alternate Jurors Nos. 3 and 5, none of whom is African-American. This comparative analysis fares no better. Juror No. 10 answered

question No. 88 confusingly, saying the death penalty was "appropriate when the convicted shall never be allowed to harm another in the way of which he was convicted." Alternate Juror No. 3 stated: "I believe life in prison would be worse," and Alternate Juror No. 5 stated: "Unsure." As is clear, none of these jurors expressed anything resembling Prospective Juror A.M.'s clearly stated view that imposition of the death penalty should be "extremely rare." Accordingly, a comparative juror analysis does not support a finding that the prosecutor's stated reason for challenging A.M. was pretextual or otherwise motivated by racial bias.

Considering the totality of the circumstances, we conclude the trial court's acceptance of the prosecutor's explanation for challenging Prospective Juror A.M., and the implicit credibility determination that necessarily underlay that acceptance, is supported by substantial evidence and thus entitled to deference. (*Lenix, supra,* 44 Cal.4th at pp. 613–614.)

c. *Prospective Juror L.L.*

Defendant also relies on a comparative analysis with White or Hispanic prospective jurors to argue the prosecutor's challenge of Prospective Juror L.L., who is African-American, was motivated by racial bias. L.L. was considered as an alternate juror only and, as defendant concedes, no alternate juror served in this case; the original 12 jurors tried the case to its termination. Although it is therefore unnecessary to consider whether any *Wheeler/Batson* error occurred as to this juror, as any error in this regard would necessarily be harmless (*People v. Roldan* (2005) 35 Cal.4th 646, 703 [27 Cal.Rptr.3d 360, 110 P.3d 289]), defendant contends the prosecutor's reasons for challenging her, if found unsupported by the record, can—when coupled with the challenges of Prospective Jurors K.B. and A.M. (discussed, *ante*)—be considered part of an overall and deliberate plan to remove all African-Americans from the jury in violation of his constitutional rights.[6] Accordingly, we examine the prosecutor's decision to challenge Prospective Juror L.L.

Asked to provide his reasons for challenging L.L., the prosecutor provided three: (1) "she was unsure about the use of scientific evidence," and the

---

[6] "A reviewing court's level of suspicion may also be raised by a series of very weak explanations for a prosecutor's peremptory challenges. The whole may be greater than the sum of its parts. When a number of jurors are struck, '[a]n explanation for a particular challenge need not necessarily be pigeon-holed as wholly acceptable or wholly unacceptable. The relative plausibility or implausibility of each explanation for a particular challenge . . . may strengthen or weaken the assessment of the prosecution's explanation as to other challenges and thereby assist the fact-finder in determining overall intent.' " (*Caldwell v. Maloney* (1st Cir. 1998) 159 F.3d 639, 651, fn. omitted.)

prosecution intended to rely strongly on such evidence; (2) she "was unsure on the death penalty"; and (3) in answering question No. 69, she indicated she "strongly disagreed" with the statement that "if the prosecution brings someone to trial, that person is probably guilty."[7] As he did at the hearing, defendant contends these explanations are inconsistent with the prosecutor's decision to refrain from challenging Jurors Nos. 10 (who is Hispanic) and 11 (who is White), as well as some other jurors, who he contends gave comparable answers or held comparable views.

The prosecutor responded to these contentions at the hearing, explaining that he had intended to challenge Juror No. 10 as well, but by that time he had only one peremptory challenge remaining and was holding it to use against Prospective Juror S.M., who was coming next and who he felt was the more objectionable of the two. He felt the same about Juror No. 11 and Alternate Juror No. 5, saying he "wasn't particularly comfortable with [those jurors] either, but I was . . . down to one peremptory [challenge], and I did not want to get [Prospective Juror S.M.] and be out [of challenges]." The prosecutor noted that although Juror No. 10's answers were similar to those of L.L., Juror No. 10 explained on voir dire that she had misunderstood some of the questions on the questionnaire and then clarified what her true answers would be. The prosecutor assured the court his decision not to challenge Juror No. 10 "had nothing to do with race."

Defendant conducts a minute dissection of the apparent death penalty views of L.L., as compared to those of Jurors Nos. 10 and 11, as well as other prospective jurors. But the prosecutor's first expressed reason concerned L.L.'s views on scientific evidence and, on that subject, the other jurors in question are distinguishable. Prospective Juror L.L. answered question No. 86 by indicating she was "unsure" about scientific evidence. By contrast, Juror No. 10 stated, "I believe this evidence is important to the jurors' decision"; Juror No. 11 stated, "I think it is very necessary to have the testing done on the items at the scene"; and Jurors Nos. 7 and 8, as well as Alternate Jurors Nos. 3 and 5, gave similar answers. Irrespective, then, of any disparities in the relative strength of these jurors' views regarding the death penalty, the prosecutor could plausibly have distinguished among them on this topic alone. In any event, the prosecutor candidly explained that he would have challenged some of the jurors now held up to comparative

---

[7] The prosecutor explained that although L.L.'s answer to question No. 69 was consistent with the presumption of innocence, as defense counsel argued, he was looking for a juror who answered this question by checking "I disagree somewhat" or "I agree somewhat." "I think most people are going to think if they arrest them and brought them to trial, he must have done something. At least that is a fair frame of mind . . . but [Prospective Juror L.L.] said [']I disagree strongly['] which to me shows that there is some type of bias that if you are arrested and you come to trial, she doesn't believe that any of these systems are working correctly to have a very strong reaction that way."

scrutiny had he possessed additional challenges and pointedly denied having a racial motive in excusing L.L., and the trial court necessarily made a credibility determination in accepting his explanations. We reiterate that " 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] *So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' "* (*Lenix, supra,* 44 Cal.4th at pp. 613–614, italics added.)

### d. *Prospective Juror S.M.*

Defendant also cites the prosecutor's challenge of Prospective Juror S.M. as evidence he acted with a racial bias. S.M., who is African-American, was considered as an alternate juror only, so her excusal, like the excusal of Prospective Juror L.L., cannot be found to have prejudiced defendant even if improper. (*People v. Roldan, supra,* 35 Cal.4th at p. 703.) Nor does her excusal suggest part of a larger plan of racial discrimination. Defense counsel below all but conceded S.M. was properly excused, admitting that although he did not agree the juror had to be excused, "I agree [the prosecutor] can explain satisfactorily [his] peremptory challenge [against her]." And so he did, noting that S.M. stated on voir dire that the prosecution in the O.J. Simpson murder trial had not proven Simpson's guilt and that she believed Satan controls this world and the people in it. As the prosecutor explained: "[I]f she didn't feel O.J. Simpson was proved [guilty], I don't want her sitting on this jury. That is [a] personal reason[] for me." In addition, "[s]he was a wild card type of juror who had extremely strong positions, and I didn't feel that she would interact with the rest of the jurors that I was anticipating selecting." The trial court agreed, noting that S.M. "had a problem, in [the] Court's opinion, dealing with certain religious concepts and things like that that may interfere with her ability to be a fair juror." The court also noted S.M. seemed annoyed by having to fill out the questionnaire. Although, as defendant now argues, other jurors who were not challenged also expressed strong religious views, none were as strident in their religious views, and none expressed similar views regarding the Simpson trial.

As is apparent, the trial court made " 'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered' " (*Lenix, supra,* 44 Cal.4th at p. 614), entitling the court's ruling to deference on appeal. Accordingly, the prosecutor's exercise of a peremptory challenge against Prospective Juror S.M. provides no basis for reversal.

### e. *Prospective Jurors D.H. and M.W.*

Defendant argues we must also add Prospective Jurors D.H. and M.W. to the comparative analysis mix. Defendant observes, however, that if D.H. had been the only African-American dismissed from the jury, defendant would agree the prosecutor's explanation concerning his challenge would not require reversal. Similarly, as to Prospective Juror M.W., defendant concedes that two factors the prosecutor cited in challenging her—"her high regard for psychiatrists and her doubts about DNA evidence"—"cannot be called absurd or pretextual." Nevertheless, defendant maintains we must reverse the judgment when we consider the challenges to D.H. and M.W. in conjunction with those against Prospective Jurors K.B., A.M., L.L., and S.M. (See fn. 6, *ante*.) Because we find the trial court did not abuse its discretion in denying defendant's *Wheeler/Batson* motions as to those four prospective jurors, however, we have no occasion to decide whether properly justified peremptory challenges may combine with others to create a prima facie showing of group bias, and we decline to do so.

On balance, after examining the record, we conclude substantial evidence supports the trial court's rulings in denying defendant's *Wheeler/Batson* motions. Accordingly, we accord those decisions the deference to which they are entitled. (*Lenix, supra*, 44 Cal.4th at pp. 613–614.)

### 4. *Alleged Improper Denial of Challenges for Cause*

During voir dire, defense counsel moved to have the trial court excuse three prospective jurors for cause, claiming their views on capital punishment would prevent or substantially impair the performance of their duties as jurors. (*Wainwright v. Witt, supra*, 469 U.S. at p. 424.) The court denied all three motions, but none of the three sat on defendant's jury. Prospective Juror R.G. was at one time seated in the box during voir dire, but defense counsel excused her by exercising a peremptory challenge. Though counsel later exhausted his allotted peremptory challenges for excusing regular jurors, he did not ask the court to grant him additional challenges or otherwise express his dissatisfaction with the jury. Prospective Juror K.W. was seated in the box as a potential alternate juror, but defendant exercised one of the six peremptory challenges allotted for challenging alternate jurors to excuse him. Ultimately, counsel used only five of the six peremptory challenges allotted to the defense for selecting the alternate jurors. The third prospective juror, L.S., was never seated in the box at all, but remained in the pool of prospective alternate jurors. As noted, *ante*, no alternate juror was needed or used, and the original 12 jurors selected tried the case to conclusion.

Defendant contends the trial court erred in denying these three challenges for cause, thereby depriving him of his constitutional rights to a fair trial, an

impartial jury, due process, and a reliable penalty determination. (U.S. Const., 6th, 8th & 14th Amends.) As we explain, the issue was not properly preserved for appellate review, and the claims are meritless in any event.

■ As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel (or defendant, if proceeding pro se) must express to the trial court dissatisfaction with the jury as presently constituted. (*People v. Bonilla* (2007) 41 Cal.4th 313, 339 [60 Cal.Rptr.3d 209, 160 P.3d 84].)[8]

Applying these principles, we conclude defendant's arguments concerning Prospective Jurors K.W. and L.S. were not preserved for appeal because he did not exhaust his six peremptory challenges allotted for choosing alternate jurors. Although he now argues in justification that he needed to hold one peremptory challenge in reserve in case he needed to use it to excuse L.S., who he claims was strongly pro-death-penalty, acceptance of this excuse would swallow the rule entirely, for a defense attorney might in every case wish to hold challenges in reserve for strategic reasons. But even were we to overlook this procedural forfeiture, we would find no possible prejudice irrespective of whether the trial court erred, because K.W. and L.S. were considered as alternate jurors only, and no alternate jurors served in defendant's trial. (*People v. Davis, supra,* 46 Cal.4th at p. 582; *People v. Boyette* (2002) 29 Cal.4th 381, 419 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

Defendant's claim regarding Prospective Juror R.G. requires a different analysis. Because defendant excused R.G. by exercising a peremptory challenge and thereafter exhausted all of the 20 challenges allotted for choosing the petit jury, he satisfied the first two requirements for preserving the issue for appellate review. As to whether he expressed dissatisfaction with the jury, defendant answers the question in two ways. First, he argues this court has "indicated a defendant need not express dissatisfaction with the jury if he/she has exhausted his/her peremptory challenges," citing *People v. Crittenden* (1994) 9 Cal.4th 83, 121, footnote 4 [36 Cal.Rptr.2d 474, 885 P.2d 887], and

---

[8] In addition, the issue may be deemed preserved for appellate review if an adequate justification for the failure to satisfy these rules is provided. There is some discrepancy in our past decisions on the exact parameters of this "justification" exception (see *People v. Wilson* (2008) 43 Cal.4th 1, 34 [73 Cal.Rptr.3d 620, 178 P.3d 1113] (conc. opn. of Werdegar, J.)), but that exception is not implicated in this case, and we do not discuss it further.

*People v. Bittaker* (1989) 48 Cal.3d 1046, 1087–1088 [259 Cal.Rptr. 630, 774 P.2d 659]. *Crittenden* clarified that an expression of dissatisfaction is in fact required, but noted that in light of arguably conflicting language in *Bittaker*, we would decline to apply this rule to cases tried before 1994, when *Crittenden* was decided. (See, e.g., *People v. Boyette, supra,* 29 Cal.4th at p. 416; *People v. Weaver* (2001) 26 Cal.4th 876, 911 [111 Cal.Rptr.2d 2, 29 P.3d 103].) Because defendant was tried in 1996, the requirement of an express statement of dissatisfaction applies to his case.

Second, defendant contends "the defense *effectively* expressed dissatisfaction with the jury when it made its *Wheeler-Batson* motion." (Italics added.) Even were that true, the trial court would no doubt have taken that statement of dissatisfaction as pertinent to the racial makeup of the jury and not as a complaint about the court's denial of defendant's challenge for cause. We thus conclude defendant has not preserved for review the correctness of the court's denial of his for-cause challenge of Prospective Juror R.G.

Were we to reach the merits of the issue, we would conclude it lacked merit. "To prevail on such a claim, defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury." (*People v. Yeoman* (2003) 31 Cal.4th 93, 114 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) "[T]he loss of a peremptory challenge in this manner ' "provides grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.*" ' " (*Ibid.*) Because none of the identified prospective jurors served on defendant's jury, nor was he forced to tolerate an incompetent juror on his jury as a result of exhausting his allotted peremptory challenges, the trial court's decision to deny his challenges for cause could not have affected his right to be tried by a fair and impartial jury. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1056 [81 Cal.Rptr.3d 651, 189 P.3d 911].)

### 5. *Allegedly Biased Questioning of Prospective Jurors*

Defendant contends the trial court committed judicial misconduct by conducting its inquiries of prospective jurors in a disparate manner that betrayed a pro-death-penalty bias. He claims that for certain prospective jurors who appeared to favor the death penalty, the court engaged in rehabilitative and leading questions in an effort to demonstrate they were qualified to serve despite their pro-death-penalty views, whereas the court's questioning of prospective jurors who had expressed an inability, reluctance, or refusal to impose the death penalty was "a study in contrast." For these "life-leaning" jurors, defendant argues, the court engaged in more perfunctory questioning, utilized no leading questions, and generally expended less effort to rehabilitate them. He contends this disparity in the manner and quality of

the trial court's voir dire questioning tainted the voir dire process, rendered it "facially biased," and unfairly resulted in "the redemptions of strongly pro-death jurors and the dismissals of anti-death jurors who might have been saved."

The exact nature of defendant's claim is unclear. To the extent he intends to argue the court erred by sustaining the prosecutor's challenges for cause to nine life-leaning jurors because they might have been rehabilitated with more rigorous questioning on voir dire, we note defense counsel declined the trial court's explicit offer to question the jurors further. Defendant thus had the opportunity to rehabilitate these jurors in an effort to show they were not excludable, had he wanted to do so. To the extent he claims the dismissal of these jurors was error because their responses did not render them excludable under *Wainwright v. Witt, supra,* 469 U.S. 412, his failure to object did not forfeit the claim. (See *People v. Hoyos, supra,* 41 Cal.4th at p. 904, fn. 16.) Nevertheless, having examined the voir dire questioning of each juror identified, we are satisfied the trial court did not abuse its discretion in granting the prosecutor's challenges for cause because each identified juror made it clear that the juror would not, or could not, vote to impose the death penalty.

For example, when told the law requires a juror to carefully consider the choice of penalty, Prospective Juror L.B. stated simply: "I would never vote for the death penalty." When the trial court followed up, she asserted she would automatically vote for life. Similarly, when asked whether he could "carefully and fairly consider both penalties in this case," Prospective Juror T.G. answered: "No, sir." Asked by the court in following up whether, upon finding the aggravating factors outweighed the mitigating ones, "would you automatically vote against the death penalty?" T.G. answered in the affirmative. With one exception, the other prospective jurors defendant identifies as "life-leaning" who were excused by the trial court gave similarly clear answers.

The one exception was Prospective Juror S.R. She indicated she was "very against capital punishment under any circumstances." She then equivocated somewhat, admitting that capital punishment is the law and that, as a juror, it was not her "personal decision." On the court's followup questions, S.R. first admitted that imposing the death penalty would be "very hard" for her but that she "believe[d] [she] could follow the law." After further questioning, S.R. concluded: "You know what, I can't, I realize just sitting here I just don't think I would impose [the death penalty]." Asked by the court whether, "based upon your personal belief then, would you automatically then vote against the death penalty?" she replied, "Yes, I would," whereupon the court sustained the prosecutor's challenge for cause. In excusing S.R., the trial court acted well within its discretion.

Although we find the trial court did not abuse its discretion by excusing the identified life-leaning jurors for cause, defendant appears to make an additional argument. He contends the trial court demonstrated a pro-death-penalty bias by striving to rehabilitate "death-leaning" prospective jurors while failing to exhibit the same vigor when questioning "life-leaning" jurors. He does not assert the trial court applied different legal standards in granting or denying challenges for cause, that the court asked improper questions, that either the court or the parties failed to take the time or lacked a fair opportunity to ascertain the true views of the jurors, or that a biased juror was allowed to serve on the jury. Properly understood, defendant's claim is one of judicial misconduct; that is, he alleges the trial court did not conduct the voir dire proceedings in a neutral fashion and thus betrayed a bias in favor of the death penalty.

We have found certain claims of judicial misconduct forfeited by the failure to object. (See, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 635 [110 Cal.Rptr.2d 441, 28 P.3d 175] [claim that the trial court improperly made "comments implying it believed defendant was guilty of murder . . ."]; *People v. Hines* (1997) 15 Cal.4th 997, 1041 [64 Cal.Rptr.2d 594, 938 P.2d 388] [same]; *People v. Sanders* (1995) 11 Cal.4th 475, 531 [46 Cal.Rptr.2d 751, 905 P.2d 420] [claim that the trial judge failed to exhibit neutrality when interjecting comments before the jury].) But even assuming without deciding that the issue is properly preserved for appellate review, no misconduct is apparent. The process known as "death qualification" of prospective jurors is an important early part of a capital trial. Trial courts must of course "be evenhanded in their questions to prospective jurors . . . and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors." (*People v. Champion* (1995) 9 Cal.4th 879, 908–909 [39 Cal.Rptr.2d 547, 891 P.2d 93].) But the court has "broad discretion over the number and nature of questions about the death penalty. We have rejected complaints about 'hasty' [citation] or 'perfunctory' voir dire. [Citation.] We also have found no error where the court relied heavily on three, four, or five general questions tracking language from *Witherspoon*[ *v. Illinois* (1968)] 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and [*Wainwright v.*] *Witt, supra,* 469 U.S. 412, 424." (*People v. Stitely* (2005) 35 Cal.4th 514, 540 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

We have reviewed the voir dire proceedings and conclude the trial court did not abuse its broad discretion in its manner of questioning. Defendant finely parses the court's questioning, arguing the brevity of the court's questioning of "life-leaning" jurors as compared to "death-leaning" ones was indicative of the court's lack of impartiality, but his cited examples involve prospective jurors who stated flatly that they could not or would not vote to impose the death penalty. For example, when asked whether she would under no circumstance consider voting for the death penalty, Prospective Juror L.L.

simply replied, "Yes." Similarly, Prospective Juror J.M. stated plainly that she could not fairly consider both penalties and that she would not vote for the death penalty. In any event, given the trial court's broad discretion in this area, we cannot predicate a finding of error merely on the number of questions the court asks. (*People v. Thornton* (2007) 41 Cal.4th 391, 425 [61 Cal.Rptr.3d 461, 161 P.3d 3].) We defer to the trial court's assessment of the sincerity of these jurors' views and conclude the brevity of the court's questioning was a function of its implicit assessment that further questioning was not likely to render the venireperson qualified to sit in a capital case.

Nor does the court's occasional use of leading questions when attempting to rehabilitate "death-leaning" jurors suggest a lack of impartiality. We trust our trial courts understand and appreciate the importance of the voir dire procedure and the need to be "evenhanded" in questioning prospective jurors in a capital case. (*People v. Champion*, *supra*, 9 Cal.4th at p. 908.) We assume the trial court formulated its questions based on the individual characteristics of each juror, including the juror's questionnaire answers and in-court demeanor. To second-guess these choices would encourage the trial court to engage in substantially the same questioning of all prospective jurors irrespective of their individual circumstance, something we have declined to do. (See *People v. Thornton*, *supra*, 41 Cal.4th at p. 425 ["A reviewing court should not require a trial court's questioning of each prospective juror in the *Witherspoon-Witt* context . . . to be similar in each case in which the court has questions, lest the court feel compelled to conduct a needlessly broad voir dire, receiving answers to questions it does not need to ask." (Citations omitted.)].)

In sum, because nothing in the record suggests the trial court lacked impartiality when it conducted voir dire, the court did not commit misconduct.

C. *Trial Issues*

1. *Admission of Allegedly Inflammatory Photographs*

During their investigation of the crime scene, police took several photographs and shot a video. Additional pictures were taken during the autopsy. At trial, the prosecutor sought to introduce into evidence 10 crime scene photographs, 12 autopsy photographs, and a 22-minute videotape. He later revised his proffer to include 18 crime scene photographs out of the 56 that had been taken. Defendant objected and moved to limit such evidence. The trial court carefully examined each photograph, admitting some that it specifically found were relevant and more probative than prejudicial, and excluding others as cumulative. Regarding the videotape, the prosecution edited it to run for only four minutes 19 seconds. After a hearing in which the

court viewed the edited videotape, the court admitted it over defendant's objection. The jury was shown the photographs and viewed the edited videotape.

On appeal, defendant concedes that some of the photographs the court admitted "either could not have inflamed the jury or were concededly admissible under [Evidence Code] section 352." He also concedes three other photographs were relevant. By contrast, he contends the court's decision to admit the remaining 12 photographs was an abuse of discretion under Evidence Code section 352 and also violated his federal constitutional rights to a fair and impartial trial, to an impartial jury, to fundamental fairness, and to a reliable penalty determination. (U.S. Const., 6th, 8th & 14th Amends.)[9] He claims these alleged errors require reversal of both the guilt and penalty phase judgments without an inquiry into prejudice. He also argues that even if we disagree the errors were automatically reversible, they cannot be found harmless under the test in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. As we explain, the trial court did not abuse its discretion in admitting the photographs or the edited videotape.

█ " 'The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion. (*People v. Scheid* (1997) 16 Cal.4th 1, 13–14 [65 Cal.Rptr.2d 348, 939 P.2d 748].) "A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." ' " (*People v. Moon* (2005) 37 Cal.4th 1, 34 [32 Cal.Rptr.3d 894, 117 P.3d 591].) The same legal standard applies to a court's decision to admit a videotape into evidence. (*People v. Cain* (1995) 10 Cal.4th 1, 33 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

That the challenged photographs may not have been strictly necessary to prove the People's case does not require that we find the trial court abused its discretion in admitting them. "[P]rosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." (*People v. Gurule* (2002) 28 Cal.4th 557, 624 [123 Cal.Rptr.2d 345, 51 P.3d 224].) "The fact that the photographic evidence may have been cumulative to other evidence does not render it inadmissible [citation], although the trial court should consider that fact when ruling on a motion to exclude evidence pursuant to Evidence Code section 352." (*Id.* at p. 625.) A court's ruling admitting such photographs will

---

[9] Although defendant mentions the videotape in his briefs, whether he intends to argue the court erred in admitting the edited videotape is unclear. We will assume for argument he intends to include the edited videotape in his argument.

not be disturbed on appeal unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v. Moon, supra,* 37 Cal.4th at p. 35.)

The crimes against the victim were especially gruesome. The autopsy surgeon noted that the victim bore a neck wound that was "[q]uite large and gaping, wide open so that it allowed visualization of the inner structures of the neck," and that "the muscles of the left neck were entirely cut away all the way down to the level of the spine." The victim also apparently had a bottle forcibly inserted in her rectum. In a moment of understatement, the trial court remarked that "the photos are not particularly nice to look at."

■■■ The photographs and the edited videotape tended to prove such unpleasant but relevant details as the cleanliness of the wound (suggesting a sharp blade, such as a box cutter, had been used and that the killer did not hesitate when striking the fatal blow) (see *People v. Gurule, supra,* 28 Cal.4th at p. 624 [clean wound indicated "the killer had no hesitation"]), the depth of the wound (suggesting the amount of force used) (see *People v. Wright* (1990) 52 Cal.3d 367, 434 [276 Cal.Rptr. 731, 802 P.2d 221] [photographs were "relevant to show the extent of the victim's injuries and the amount of force used in the commission of the murder"]), the position of the body and the condition of the victim's clothes (which might be relevant to the existence of consent), and whether penetration with the bottle occurred before death (based on the amount of blood produced). That the trial court took no small amount of time reviewing each photograph, listening to counsel's arguments as to each one, and then excluding several as cumulative but admitting others, and that it admitted the videotape only after it had been reduced in length by more than 80 percent, strongly supports the conclusion that the trial court did not abuse its discretion; that is, the court did not act arbitrarily or with caprice. As we have often observed, murder is seldom pretty "[b]ut as unpleasant as these photographs are, they demonstrate the real-life consequences of [defendant's] actions. The prosecution was entitled to have the jury consider those consequences." (*People v. Bonilla, supra,* 41 Cal.4th at p. 354.) We have examined the photographic exhibits and conclude the trial court's decision to admit the photographs fell well within its broad discretion. To the extent defendant means to include admission of the edited videotape in this argument, we similarly find no error in admitting the tape. Accordingly, the trial court committed no statutory or constitutional error.

2. *Admission of Evidence of Defendant's Leisure Activities After the Killing*

The victim in this case was killed in the early morning hours of Friday, February 11, 1994. John Selby, one of defendant's coworkers and friends,

testified for the People and reported that defendant had visited him at his home on Saturday, February 12, and spent the night. Defendant, Selby, and Selby's girlfriend Susan Lee went sightseeing in San Francisco the next day (Sunday), visited the Hard Rock Cafe, and stayed the night in the city. On Monday, the three (along with Lee's sister) drove to the mountains and went snowboarding. During this time, according to Selby, defendant appeared normal. Defendant objected to this evidence on relevance grounds. After confirming with defense counsel that the basis of the objection was that the evidence was irrelevant, the trial court overruled the objection.[10]

On cross-examination, defendant essentially confirmed the facts regarding his actions following the crime, explaining that he, Selby, and Selby's girlfriend had gone to San Francisco because it was Selby's birthday and that he (defendant) wanted to leave town for the weekend. Defendant agreed with the prosecutor when, referring to this weekend outing, he was asked whether he "tried to act real normal so nobody would be on to you." He confirmed that after he killed the victim, he went snowboarding.

Defendant contends the trial court erred by overruling his relevancy objection and that the error constituted a violation of his constitutional rights to due process, a fair trial, and a reliable death penalty judgment. (U.S. Const., 8th & 14th Amends.) These contentions are meritless. Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence." Relevant evidence is defined as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Defendant argues that because the outing to San Francisco and the later snowboarding trip occurred more than 60 hours after the killing, such evidence could have had no relevance to his heat-of-passion defense, as the emotional effect of any provocation would by then have dissipated. In other words, he claims he took the trips to San Francisco and to go snowboarding at a time "when, as a matter of law, an objectively reasonable cooling period had passed and a person of normal temperament would no longer have been enraged." (Italics omitted.) But that defendant was behaving normally, engaging in leisure activity, after forcibly raping and brutally slashing the throat of a woman just days before, has a "tendency in reason to prove . . . [a] disputed fact that is of consequence to the determination of the action" (Evid. Code,

---

[10] The parties' discussion of the objection and the trial court's initial ruling on it apparently occurred in an unreported sidebar conference. Later, the trial court clarified on the record the substance of the unreported conference. We trust the trial bench needs no reminder that all such sidebar conferences in capital cases must take place on the record. (§ 190.9; *People v. Harris* (2008) 43 Cal.4th 1269, 1281 [78 Cal.Rptr.3d 295, 185 P.3d 727].)

§ 210); that is, that defendant in fact acted with *malice aforethought* and not in the heat of passion. The jury could reasonably infer from the challenged evidence that defendant had in fact intended to kill the victim in cold blood, because a person who had acted under the influence of a passionate impulse would not have behaved in so cavalier a fashion so recently after committing such a violent and transgressive act. Of course a contrary inference could have been argued, but that does not render the evidence irrelevant. We thus conclude the trial court did not err when it overruled defendant's relevance objection.

Defendant's subsidiary arguments fare no better. He argues the evidence was inadmissible because "the only purpose it served was to suggest defendant was amoral." As we have explained, the evidence was relevant to show defendant's intent at the time of the crime. To the extent he now claims the evidence was impermissibly prejudicial or that it comprised improper character evidence, these matters should have been raised by objections under Evidence Code sections 352 and 1101, respectively. Failure to do so forfeited those claims on appeal. In any event, because defendant himself testified and related the same events, any error was manifestly harmless under any standard.

Defendant also suggests that the prosecutor, in his closing argument at the guilt phase, committed misconduct by relying on the evidence of defendant's postcrime activities to incite moral outrage among the jurors. Defendant did not object on that ground, and so the issue was forfeited for appeal. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673]; see *People v. Champion, supra,* 9 Cal.4th at p. 940 [any prejudice from the prosecutor's argument inviting the jury's outrage at the crime could have been cured by a timely objection, so the failure to object forfeited the claim].)

█ Finally, defendant contends the admission of this evidence over his relevance objection violated various of his constitutional rights. As we recently explained, however: "The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' [Citation.] As defendant provides no elaboration or separate argument for these constitutional claims, we decline to address further these boilerplate contentions." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010 [81 Cal.Rptr.3d 299, 189 P.3d 300].) The trial court's ruling on defendant's relevance objection was not error, and in any event it did not violate defendant's constitutional rights.

### 3. *Exclusion of Evidence of Eric Thomas's History of Violence*

Defendant sought to cross-examine the victim's boyfriend, Eric Thomas, to explore his alleged history of domestic violence against the victim. The

prosecutor objected, and the issue was discussed outside the jury's presence. Defense counsel focused on two small bruises, one on the victim's hand and one on her thigh;[11] because the coroner could not pinpoint with precision when the victim had received those injuries, defense counsel argued that Thomas could have inflicted them. This evidence, he claimed, would have impeached Thomas's testimony that the victim was uninjured and unmarked when she got out of the car the night of her death. Further, he claims, had the jury believed that Thomas, and not defendant, had inflicted those minor injuries, the evidence of those injuries could not have been used to bolster the prosecution's theory that defendant forcibly raped the victim. After hearing Thomas testify regarding the nature of his relationship with the victim (again, outside the jury's presence), the trial court sustained the prosecutor's motion to exclude the evidence under Evidence Code section 352. Defendant contends the trial court's ruling was error and that the error constituted a violation of his constitutional rights to present a defense, to confront the witnesses against him, to compulsory process, to due process, to a fair trial, and to a reliable death penalty judgment. (U.S. Const., 6th, 8th & 14th Amends.)

A trial court has broad discretion under Evidence Code section 352 to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." This discretion allows the trial court broad power to control the presentation of proposed impeachment evidence " ' "to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]' " (*People v. Lewis* (2001) 26 Cal.4th 334, 374–375 [110 Cal.Rptr.2d 272, 28 P.3d 34].) On appeal, we evaluate the court's ruling by applying an abuse of discretion standard. (*People v. Hovarter, supra*, 44 Cal.4th at p. 1005.)

The trial court did not abuse its discretion. Defense counsel informed the trial court that he had no evidence Thomas had in fact inflicted the bruises on the victim's thigh and hand, other than speculation drawn from Thomas's sometimes stormy relationship with the victim and the fact the coroner could not state with precision the exact time the bruises had been inflicted. Thomas, in testimony outside the jury's presence, flatly denied inflicting any injuries on the victim on the night in question. Under these circumstances, the trial court reasonably concluded the proposed evidence, though it perhaps raised the barest speculation that Thomas had struck the victim on the night in question, was "substantially outweighed by the collateralness of it all and the time [it would take to prove the point]." This was a routine matter of weighing the evidence's probative value against the probability its admission

---

[11] On appeal, defendant also relies on a bruise the size of a nickel on the victim's temple.

would "necessitate undue consumption of time" (Evid. Code, § 352), and the trial court's ruling was both reasoned and reasonable.

In any event, any possible error was harmless. Although defense counsel was unable to elicit from Thomas any evidence suggesting he had a violent relationship with the victim, Nancy Warner, the victim's friend, testified that Thomas had drunk several beers the night the victim was killed, that he was somewhat intoxicated but not drunk, and that he became "cocky" and "obnoxious" towards the victim when he was drunk. Thomas himself testified the victim had abandoned their car in anger on no less than six prior occasions, evidence from which the jury could have inferred that the victim and Thomas endured a disputatious relationship. The parties also stipulated that Thomas had three previous misdemeanor convictions—for battery, assault, and burglary—and the jury heard Thomas admit he had three prior convictions for drunk driving. The jury thus had ample reason to question Thomas's credibility, and it no doubt weighed these facts against defendant's own testimony that he had had sex with and then killed the victim. Any error was thus harmless under any standard.

Finally, having found no error under Evidence Code section 352, we also reject defendant's various constitutional claims. (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1010 ["The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' "].)

### 4. *Admission of Evidence of Multiple Cutting Devices*

Defendant contends the trial court erred by admitting evidence that police found a box cutter and a small knife in his bedroom and another box cutter and a larger knife in his car. Because none of these cutting devices could definitively be identified as the murder weapon, he claims admission of this evidence contravened Evidence Code sections 350 (only relevant evidence is admissible) and 352 (evidence may be excluded as more prejudicial than probative). He also contends admission of this evidence violated his rights to due process, a fundamentally fair trial, and a reliable sentencing determination under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We disagree and, in any event, find no possible prejudice.

The victim's neck exhibited a deep wound more than five inches long and up to two inches wide. Dr. Robert Anthony, a forensic pathologist who conducted the autopsy, testified that the wound required six to 12 separate cutting motions. Some small nonlethal cuts were evident next to the fatal wound. Dr. Anthony testified these latter cuts were probably caused by a knife tip. The victim also bore two postmortem cutting wounds on her left breast.

Early in the trial, the prosecutor moved to admit evidence of the two knives and the two box cutters. In an Evidence Code section 402 hearing out of the jury's presence, Dr. Anthony testified that many types of knives could have caused the fatal wound, as it was not unique or distinctive, and that any of the four cutting devices police found could have been the murder weapon. The trial court found the evidence more probative than prejudicial and ruled evidence of the four cutting devices would be admitted.

Once more before the jury, Detective Bell described the discovery of the two knives and two box cutters, observing that they were not hidden and nothing suggested to him they had been used as weapons. Bell surmised that defendant used the box cutters in his work at IBS. Dr. Anthony reiterated his testimony for the jury and on cross-examination admitted that many types of knives could have caused the victim's injuries. When defendant testified, he admitted he had killed the victim with the Swiss Army knife he kept on his keychain. He denied stabbing or cutting the victim with a box cutter or with the knives found in his car and bedroom.

Because defendant was accused of killing the victim by cutting her throat and shortly after the crime was found in possession of several cutting devices, any one of which could have been the murder weapon, the trial court acted within its discretion in finding the evidence to be relevant. (*People v. Avila*, *supra*, 38 Cal.4th at p. 578.) Moreover, as it was made clear to the jury that a forensic analysis could not definitively identify any of the four devices as the murder weapon, the court did not abuse its discretion in finding the evidence to be more probative than prejudicial. (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1005.)

To the extent defendant argues the trial court erred under *People v. Riser* (1956) 47 Cal.2d 566 [305 P.2d 1],[12] and subsequent authority, he is mistaken. *Riser*, cited by the prosecution in support of its motion to admit evidence of the four cutting devices found in defendant's constructive possession, explained that "[w]hen the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Riser*, at p. 577.) Because this was not a case in which the prosecution relied on a specific weapon or type of weapon, *Riser* is inapposite. (*People v. Cox* (2003) 30 Cal.4th 916, 955–956 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

---

[12] *People v. Riser, supra,* 47 Cal.2d 566, was overruled on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98 [338 P.2d 428], and *People v. Morse* (1964) 60 Cal.2d 631, 648–649 [36 Cal.Rptr. 201, 388 P.2d 33].

In any event, any possible error was harmless under any standard. The evidence of the four cutting devices included two box cutters of a type normally used in defendant's work at IBS, rendering his possession of them relatively innocent. The other two were knives of a fairly common type. In short, none of the four cutting devices was particularly prejudicial. Moreover, in light of defendant's own testimony that he used his Swiss Army knife to kill the victim, admission of evidence of these four cutting devices was merely superfluous information that could not have prejudiced him. Although defendant contends admission of the evidence rendered him vulnerable to the damaging implication that he was a person of bad character because he habitually carried, and thus was "inclined to use, deadly weapons," it is defendant himself who testified he had killed the victim with a knife he habitually kept on his keychain.

Having found no statutory error and no possible prejudice, we also reject defendant's related constitutional claims. (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1010.)

### 5. *Alleged Prosecutorial and Police Misconduct*

Defendant contends he was denied a fair trial by two aspects of the colloquy between the prosecutor and Detective Bell. Initially, Bell testified the victim's blood-alcohol level was not a critical factor in his investigation of the murder. When the prosecutor asked why that was so, Bell replied: "It doesn't matter how intoxicated she may or may not have been, it simply gave no one the right to do to her what they did." The trial court sustained defense counsel's objection to this answer. The prosecutor persisted in this line of questioning, asking: "And through your knowledge of how investigations work you know that you're going to get a blood-alcohol level from [the victim's] body?" Defense counsel objected again, citing the question as leading. The court agreed and sustained the objection. The prosecutor made two more unsuccessful attempts to elicit information about the victim's blood-alcohol level before abandoning the attempt.

Defendant contends Detective Bell "had no right to voice this irrelevant bit of sanctimony" and that his "answer constituted not only misconduct, but serious misconduct" because, as a veteran homicide detective, Bell should have known that "his opinions on legal issues do not matter at trial" and that his comments "seriously undercut [defendant's] only defense," presumably that Farrar consented to have sex and defendant killed her in a fit of blinding rage when she falsely told him she had AIDS. Defendant cites no authority for the proposition that, simply by answering an attorney's questions, a witness commits misconduct that could require reversal of the resulting conviction. In any event, the trial court sustained defense counsel's

objection, and we must assume the jury followed the trial court's instruction not to consider testimony that was the subject of a successful objection. (See CALJIC No. 1.02.) Had defendant believed the jury should have been more directly admonished on this point, it was incumbent on him to request such an admonishment. To the extent defendant argues the prosecutor committed misconduct simply by eliciting Detective Bell's remarks concerning the victim's blood-alcohol level, we disagree. " 'Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 379–380 [42 Cal.Rptr.3d 621, 133 P.3d 534].) We thus find no error; a fortiori we find no federal constitutional error occurred as a result of this fleeting remark.

Following the exchange about the victim's blood-alcohol level, the prosecutor questioned Detective Bell about searching defendant's car and finding a box cutter and a knife. During this questioning, the prosecutor several times described these devices as "weapons." For example, the prosecutor asked: "How many weapons did you find?" and "Can you describe the weapons that were found?" Defense counsel eventually objected to the characterization of what Detective Bell found as "weapons." Before the court ruled on the objection, the prosecutor offered to rephrase his questions. In response to the prosecutor's rephrased questions, Bell described the knife he found in defendant's car as a "survival or combat type folding knife." Defense counsel made no objection to this last answer.

Although defendant suggests this colloquy between the prosecutor and Detective Bell had been prepared in advance in order to place improper evidence before the jury,[13] he acknowledges the prosecutor's good or bad faith is not relevant for this inquiry. (*People v. Hill, supra,* 17 Cal.4th at p. 823 [showing of bad faith not required to prove prosecutorial misconduct].) Defendant nevertheless argues the result of this allegedly improper questioning was to create unfairly for the jury the impression that defendant was a dangerous man who surrounded himself with weapons. Because defense counsel objected to the use of the word "weapons" and the prosecutor acquiesced by agreeing to rephrase his question, however, these brief and fleeting references were not so intemperate, egregious, or reprehensible as to constitute prosecutorial misconduct under state law or federal constitutional law. (*People v. Abilez* (2007) 41 Cal.4th 472, 494 [61 Cal.Rptr.3d 526, 161 P.3d 58].)

---

[13] According to defendant: "One would have to be exceedingly credulous to believe the foregoing three-page volley of improper questions and answers was unrehearsed."

### 6. *Misreading Jury Instructions*

When the trial court read the instructions to the jury, it misspoke on three occasions. One mistake was trivial: when instructing on the meaning of consent in a sexual assault case (CALJIC No. 1.23.1), the court said: "The person must freely and voluntarily and have knowledge of the nature of the act or transaction involved." The correct instruction reads: "The person must *act* freely and voluntarily . . . ." (Italics added.) More substantial was the court's mistake when reading the instruction on manslaughter and the heat of passion defense (CALJIC No. 8.42). The court mistakenly told the jury: "The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act *reasonably* and without deliberation and reflection, and from such passion rather than from judgment." (Italics added.) The correct instruction reads: ". . . to act *rashly* . . . ."

The third mistake was the most serious. When instructing on the intent required to prove the crime of penetration with a foreign object (§ 289, subd. (a); see CALJIC No. 10.30), the trial court told the jury: "The specific intent to cause sexual abuse, as used in this instruction, does *not* purport to injure, hurt—does *not* mean the purpose to injure, hurt, cause pain or cause discomfort. It does not mean that the perpetrator must have been motivated by sexual gratification or arousal or have a lewd intent." (Italics added.) The correct instruction reads: "The 'specific intent to cause sexual abuse,' as used in this instruction, means a purpose to injure, hurt, cause pain or cause discomfort." In other words, by twice inserting the word "not," the trial court told the jury the opposite of the correct definition.

Defendant contends these errors violated his constitutional due process rights to a fair trial and to present a defense (U.S. Const., 6th & 14th Amends.), that the first two errors require reversal because they cannot be shown to be harmless beyond a reasonable doubt, and that the third error requires reversal without an inquiry into prejudice because it constitutes a structural error. (See *Johnson v. United States* (1997) 520 U.S. 461, 468 [137 L.Ed.2d 718, 117 S.Ct. 1544] [structural error is a " 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself . . .' "].)

■ The trial court committed no reversible error, structural or otherwise. The risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke. "We of course presume 'that jurors understand and follow the court's instructions.' [Citation.] This presumption includes the

written instructions. [Citation.] To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control." (*People v. Wilson, supra,* 44 Cal.4th at p. 803.) Because the jury was given the correctly worded instructions in written form and instructed with CALJIC No. 17.45 that "[y]ou are to be governed only by the instruction in its final wording,"[14] and because on appeal we give precedence to the written instructions, we find no reversible error. (See also *People v. Mungia* (2008) 44 Cal.4th 1101, 1132–1133 [81 Cal.Rptr.3d 614, 189 P.3d 880]; *People v. Box* (2000) 23 Cal.4th 1153, 1212 [99 Cal.Rptr.2d 69, 5 P.3d 130].)[15]

## II. PENALTY PHASE

### A. Facts

The prosecution called three witnesses to provide evidence of the impact Sherri Farrar's death had on their lives. Rebecca Rommel testified she was the victim's grandmother. When Farrar was three years old, she had life-threatening surgery. Rommel took custody of both Farrar and her sister Brandi after the surgery and raised them as her own children. Farrar also had another younger sister and brother, but she was extremely close to her sister Brandi. Rommel described Farrar as a warm and generous person with a big smile. Although Farrar moved from the family home after high school to live with Eric Thomas, she called Rommel nearly every day. Farrar's death deeply affected Rommel, who described her life as "horrible" since the murder. Rommel's husband was equally upset. Though Farrar was only 21 years old when she was killed, a surprising number of people attended her funeral.

Eric Thomas testified he met Sherri Farrar at the El Dorado County Fair in 1989 and experienced love at first sight. She was the first woman he had ever loved, and they were together for six years. She was his best friend as well as his girlfriend. She was always in a good mood and made people smile. At Rommel's suggestion, he had Farrar identified with his last name on her

---

[14] CALJIC No. 17.45 provides: "The instructions which I am now giving to you will be made available in written form [if you so request] for your deliberations. They must not be defaced in any way. [¶] [You will find that the instructions may be typed, printed or handwritten. Portions may have been added or deleted. You must disregard any deleted part of an instruction and not speculate as to what it was or as to the reason for its deletion. You are not to be concerned with the reasons for any modification. [¶] Every part of the text of an instruction, whether, typed, printed or handwritten, is of equal importance. *You are to be governed only by the instruction in its final wording.*]" (Italics added.)

[15] Although an erroneous oral recitation of a jury instruction can be raised on appeal without an objection should it implicate a "substantial right[]" of a criminal defendant (§ 1259), both the prosecutor and defense counsel remain free to object and have the trial court correct the error so as to avoid any jury misunderstanding.

headstone "[b]ecause we should have been married." In addition to the cemetery headstone, a marker was placed on White Rock Road at the site of her murder. Thomas sometimes takes their son, who was four years old at the time of trial, to that spot. It is difficult to explain to their son what happened to his mother.

Brandi Farrar testified she is the victim's sister, and she considered her her best friend. She described her sister as "always wearing a smile," "always had good things to say," and "[t]he kindest person I've ever known." Brandi helps maintain the memorial at the spot where her sister was killed. She read for the jury a poem she had composed that she read at her sister's funeral.

In addition to these witnesses, two sheriff's deputies testified they found two sharpened toothbrushes, as well as other potentially dangerous items, when they searched defendant's cell. The prosecution also introduced an autopsy photograph that had been excluded at the guilt phase, some other photographs of Farrar while she was alive, and a videotape of Thomas showing his reaction when he was told of Farrar's death. The parties stipulated that defendant had suffered three criminal convictions in Colorado in 1992: felony possession and distribution of marijuana, felony second degree burglary, and third degree assault.

Defendant's case in mitigation fell into four categories. The first, dominated by his mother's testimony, described defendant's turbulent, dysfunctional, and often violent childhood. Kathy Glaneman testified she was living in Roseville, Ohio, when at the age of 19 years she gave birth to defendant. Defendant's biological father abandoned them. She moved from her parents' home and eventually moved in with Bill Glaneman, who initially treated defendant well. After she and Glaneman had children of their own, however, he changed, became physically and sexually assaultive, began abusing drugs and alcohol, and treated defendant poorly as compared to Glaneman's biological children. Glaneman also began beating her. When defendant was six or seven years old, he tried to intercede, but his stepfather would beat him.

The police were often called and Bill Glaneman was sometimes arrested for drunkenness or spousal abuse, but defendant's mother never cooperated with the police. Neighbors and family members observed both defendant and his mother bearing the bruises and other injuries typical of such physically abusive relationships. Glaneman's jealousy and controlling nature led him to put chicken wire on the windows, nail the windows shut, and padlock the doors to prevent Kathy and the children from leaving the house when he was at work. He sometimes tied her to the bedpost to prevent her from leaving after he had fallen asleep. More than once she attempted to leave him, but he

always found her, beat her severely, and threatened to kill the children. Believing it would change their relationship for the better, she married him.

The family moved from Ohio to Arizona, spending a year on the road. The children did not go to school during this time. They stayed at a religious school in Arizona and eventually went to the Los Angeles area, settling at the Zoe Christian Center, a homeless shelter near Oxnard. The communal living situation forced Bill Glaneman to scale back his assaultive conduct, but it nevertheless continued. On one occasion, according to defendant's mother, Glaneman ripped her shirt off and forcibly cut her bra off with some scissors. Another time, Glaneman became angry when he saw her speaking to one of the male teachers at the center. In retaliation, he forcibly raped her and inserted a soda bottle or flower vase in her rectum. Defendant and his siblings were in the same room during this assault, separated only by a partition made from a hanging bed sheet.

Joanne McAllister, the principal at the Zoe Christian Center, testified she had seen Glaneman beat defendant and that defendant was bruised daily from these encounters. Defendant's mother did nothing to stop the beatings. The situation was one of the most abusive McAllister had ever seen.

Defendant's mother allowed defendant to go and live with John Rennell, a ministry volunteer who had befriended him, believing that removing defendant from the family unit would strengthen her marriage. Rennell corroborated that he did volunteer ministry work at the Zoe Christian Center around that time and knew defendant as a smart, athletic, and loving child. Although he never personally saw Bill Glaneman physically abuse defendant or his mother, once, when Rennell saw defendant walking with a limp, defendant told him he had injured himself jumping off a roof to escape Glaneman, who was trying to strangle him. Rennell admitted that when defendant came to live with him, he had trouble with him because defendant engaged in theft and vandalism. Defendant was 12 years old during his time with Rennell.

Defendant's mother and her other two children moved with Glaneman to Sacramento, leaving defendant with Rennell. Glaneman forbade defendant's mother from contacting defendant. Kathy Glaneman lost track of defendant's whereabouts during this time, but eventually located him two or three years later living with her mother in Ohio. Defendant came back to live with his mother and Glaneman in Sacramento and the fights continued, although defendant was now bigger. Defendant's mother eventually left Glaneman and obtained a restraining order, although he continued to terrorize her. He rented the apartment next to hers, fired his shotgun in his apartment every two or three days, threatened her with knives, and said he had a body bag for her. By the time she filed for divorce, defendant was 15 or 16 years old and had

moved out to live with his girlfriend in Colorado. He returned to Sacramento in 1993, and both defendant and his mother began working at IBS in the latter part of that year.

The second category of mitigation evidence was provided by acquaintances who described defendant after he left home. Between the ages of 15 and 21, defendant lived in Colorado with an ever-changing array of friends, acquaintances, and girlfriends. They related how defendant was polite, considerate, helpful around the house, and nonviolent. Susan Andracki testified that she had been defendant's girlfriend when he was 18 years old. She was a single mother, and defendant was good with her child. The relationship was not a healthy one, however, as they often argued and both drank to excess. They once got into an argument and defendant struck her on the cheek, leading to his conviction for assault. When defendant left to go to Texas with another woman, Andracki took him off the apartment's lease. When he returned, he broke into the apartment, taking his clothes as well as several items belonging to Andracki, including her television and wedding ring, leading to his arrest for burglary. She averred that he was not a violent person.

The third category of mitigating evidence was provided by experts who opined that defendant suffered from posttraumatic stress disorder, or PTSD. Dr. Robin LaDue and Dr. G. Robert Baker both testified at length, explaining they had examined defendant and concluded that as a result of his violent and stressful childhood, he suffered from PTSD.

The fourth and final category of mitigating evidence came from two polygraph experts. John Smith opined that, based on his examination, defendant was likely speaking the truth when he claimed the victim came with him voluntarily, that they had had consensual sex, and that she then claimed she had AIDS. Dr. Stanley Abrams testified he believed only one question was relevant and that defendant was truthful in claiming that the victim had voluntarily agreed to have sex with him.[16]

B. *Issues*

1. *Admission of Additional Photograph*

The prosecutor moved in the penalty phase to admit exhibit 133, an additional autopsy photograph that had been excluded in the guilt phase.

---

[16] The trial court initially denied defendant's motion to admit this polygraph evidence but reconsidered and, after hearing the witnesses testify outside the jury's presence as an offer of proof, reversed itself and admitted the evidence. Neither party addresses the admissibility of this evidence, and so we express no opinion on that subject. (See *People v. Richardson*, *supra*, 43 Cal.4th at pp. 1032–1033; Evid. Code, § 351.1.)

Defendant objected, contending the picture exaggerated the size of the victim's neck wound, was cumulative to the previously admitted photographs, and was more prejudicial than probative. The court admitted the photograph. Defendant contends in doing so the trial court committed prejudicial error.

A trial court has broader discretion to admit photographic evidence of the crime at the penalty phase than at the guilt phase. "This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences (§ 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present." (*People v. Bonilla, supra,* 41 Cal.4th at pp. 353–354.) Defendant acknowledges this rule, but nevertheless contends admission of exhibit 133 was prejudicial error because the photograph made the victim's wound appear larger than it was and was thus misleading. We have examined the photograph and conclude the court did not abuse its discretion in admitting it. Even were we to assume otherwise, there could have been little prejudice, as the jury had already convicted defendant and had examined all the other photographs of the crime scene and the autopsy.

### 2. *Admission of Exhibits 138 and 139*

Defendant contends the trial court erred by admitting into evidence exhibits 138 and 139, two charts the size of small posters proffered by the prosecution. The proposed exhibits listed the symptoms of two mental conditions, antisocial personality disorder (APD) and conduct disorder, as set forth in the DSM-IV.[17] As we explain, many of the specific complaints defendant now raises on appeal were forfeited for lack of a specific objection. Were we to overlook this procedural obstacle, we would find no error and no possible prejudice.

As noted, defendant called two experts at the penalty phase, Dr. Robin LaDue and Dr. G. Robert Baker, both of whom informed the jury they had concluded defendant suffered "moderate to severe" PTSD, as a result of his chaotic and violent childhood. Both also addressed whether defendant suffered from APD. Dr. LaDue concluded defendant's test results did not strongly suggest APD. On cross-examination, the prosecutor recited several of the symptoms for APD listed in the DSM-IV; suffering from a conduct

---

[17] The DSM-IV is an acronym for the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, published in 1994 by the American Psychiatric Association. "The DSM-IV is recognized by the courts as a standard reference work containing a comprehensive classification and terminology of mental disorders." (*Sonoma State University v. Workers' Comp. Appeals Bd.* (2006) 142 Cal.App.4th 500, 503, fn. 2 [48 Cal.Rptr.3d 330].)

disorder before the age of 15 is a significant symptom.[18] Dr. LaDue admitted defendant had in the past exhibited several of the symptoms of a conduct disorder, such as failure to conform to social norms with respect to lawful behavior and deceitfulness. On redirect, however, Dr. LaDue testified that while defendant had exhibited some of the symptoms, "he does not have the full criteria." She explained that to make a diagnosis one looks not just to the list of symptoms, but also to the motivations for the behavior. Since she had questions about why defendant engaged in some of the identified behaviors (such as why he ran away from home), Dr. LaDue concluded the evidence was too weak to firmly conclude defendant had exhibited some of the conduct disorder symptoms before he turned 15 years old. In eliciting this testimony, defense counsel used a piece of paper listing the symptoms for a conduct disorder.

Dr. Baker opined that his tests showed defendant exhibited "pieces" of different disorders, including APD, but that he did not actually suffer from APD. On cross-examination, the prosecutor recited the symptoms of APD and suggested defendant satisfied enough of them to be diagnosed as suffering from APD. Dr. Baker responded that defendant "came close to meeting a conduct disorder, that he does have a personality disorder, but it is not a strict antisocial one."

In cross-examining the polygrapher, Dr. Stanley Abrams, the prosecutor in his questions implied that someone suffering from APD could fool a polygraph test, but on redirect Dr. Abrams testified research has shown that not to be the case.

Defendant moved to admit five exhibits comprising charts related to his experts' PTSD diagnosis. The prosecutor objected, arguing the experts' testimony spoke for itself. The court overruled the objection and admitted the exhibits. Thereafter the prosecutor moved to admit two charts of his own, listing the DSM-IV's diagnostic criteria for APD (exhibit 138) and for conduct disorder (exhibit 139). Defendant objected but did not state the ground of his objection. The prosecutor argued that he had used the charts when examining Dr. Baker and that they simply listed the DSM-IV's diagnostic criteria for APD and conduct disorder and thus were the "same as" defendant's exhibits, which listed the diagnostic criteria for PTSD. Agreeing that the prosecutor had referred to the charts in his cross-examination, the trial court overruled defendant's objection and admitted exhibits 138 and 139.

---

[18] According to the DSM-IV, a primary diagnostic criterion for APD is that "[t]here is evidence of Conduct Disorder . . . with onset before age 15 years." (American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) p. 650, citation omitted.) The diagnostic criteria for a conduct disorder is set forth in the DSM-IV section 312.8.

■ Defendant assigns several errors to the trial court's decision to admit the two charts as exhibits. He claims their admission permitted the prosecutor to improperly express during closing argument his personal opinion that defendant suffered from APD. In addition, he claims the charts were misleading because an opinion about APD can be presented only by a qualified medical expert, that the checklist of symptoms on the charts threatened to mislead the jury into thinking it could itself diagnose defendant,[19] and that there was no competent evidence defendant suffered from APD. Although defendant objected generally to the admission of the charts, his objection cited none of these specific concerns. Evidence Code section 353, subdivision (a) requires that an objection to evidence be "timely made and so stated as to make clear the specific ground of the objection or motion . . . ." As we have explained: " 'Specificity is required both to enable the court to make an informed ruling on the . . . objection and to enable the party proffering the evidence to cure the defect in the evidence.' " (*People v. Boyette, supra*, 29 Cal.4th at p. 424.) Accordingly, we conclude defendant did not preserve his specific claims for appellate review.

■ Were we to address the merits of defendant's claims, we would find no error. Because the defense experts relied on the DSM-IV to reach their opinions, the prosecutor was permitted to explore their familiarity with the DSM-IV on cross-examination. (Evid. Code, § 721; *People v. Kozel* (1982) 133 Cal.App.3d 507, 535 [184 Cal.Rptr. 208].) Defense counsel, apparently holding a sheet of paper with the same list of diagnostic criteria, touched on the subject on redirect. The various DSM-IV criteria for PTSD, APD, and conduct disorder were thus already before the jury when the court admitted both defendant's exhibits and those proffered by the prosecutor. This was not error. Trial courts have broad discretion to admit demonstrative evidence such as maps, charts, and diagrams to illustrate a witness's testimony. (*People v. Kynette* (1940) 15 Cal.2d 731, 755–756 [104 P.2d 794], overruled on another point in *People v. Snyder* (1958) 50 Cal.2d 190, 197 [324 P.2d 1]; *People v. Jones* (1962) 205 Cal.App.2d 460, 467 [23 Cal.Rptr. 418] ["[T]he right to use this form of evidence is within the sound discretion of the trial judge."]; see also *People v. Sassounian* (1986) 182 Cal.App.3d 361, 400–401 [226 Cal.Rptr. 880] [approving admission of a map and other written material]; cf. *People v. Riggs* (2008) 44 Cal.4th 248, 325, fn. 40 [79 Cal.Rptr.3d 648, 187 P.3d 363] [prosecutor did not commit misconduct by referring to a chart].)

---

[19] Defendant attaches to his opening brief some written material from three mental health experts to bolster his assertion that a proper diagnosis of a mental condition requires more than an assessment of the listed symptoms in the DSM-IV. None of this material was before the trial court. To the extent defendant means to request judicial notice of this material, we agree with respondent that the material submitted is not eligible for judicial notice under either Evidence Code section 451 or 452. Accordingly, we deny the request for judicial notice.

Finally, inasmuch as both defense counsel and the prosecutor referred to the DSM-IV criteria when questioning the defense experts about APD, the court's admission of exhibits 138 and 139, even if error, could not have been prejudicial under any standard.

### 3. *Admission of Evidence Defendant Possessed Weapons in His Cell*

Prior to trial, defendant was detained in county jail in a cell by himself. Police searched his cell and discovered a number of items, including two sharpened toothbrushes, a paper cone embedded with metal staples, and some other items that appeared to be made of metal paper clips. When the prosecutor announced before trial his intention to introduce evidence of defendant's possession of these items under section 190.3, factor (b) ("[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"), defendant objected on the ground the found items did not qualify under section 190.3, factor (b). At defendant's request, the court held an Evidence Code section 402 hearing at which two police officers testified that several of the items could be used as deadly weapons. The court ruled the evidence was admissible. The same officers then essentially repeated their testimony before the jury. On cross-examination, the officers averred they had never personally encountered a case in which an inmate had used a sharpened toothbrush as a stabbing device.

Defendant contends this evidence violated his constitutional rights to a fair trial, an impartial jury, a reliable penalty determination, and freedom from cruel and unusual punishment. (U.S. Const., 5th, 6th, 8th & 14th Amends.) The contention is frivolous. Evidence of possession of weapons in jail is admissible under section 190.3, factor (b). (See, e.g., *People v. Combs* (2004) 34 Cal.4th 821, 857–859 [22 Cal.Rptr.3d 61, 101 P.3d 1007].) Although the exact utility of the constructions with paper clips and staples was somewhat unclear, the sharpened toothbrushes were unquestionably weapons that qualified for admission under section 190.3, factor (b). (See *People v. Ward* (2005) 36 Cal.4th 186, 197 [30 Cal.Rptr.3d 464, 114 P.3d 717] [sharpened toothbrushes admitted under § 190.3, factor (b)].) Numerous out-of-state authorities have recognized essentially the same point. (*Dozier v. Selsky* (N.Y.App.Div. 2008) 54 A.D.3d 1074 [864 N.Y.S.2d 188, 189] [violation of prison rules affirmed for possession of a weapon, i.e., a sharpened toothbrush]; *Spann v. State* (Miss.Ct.App. 2001) 797 So.2d 365, 367 [sharpened toothbrush can be a deadly weapon]; cf. *Neal v. State* (Tex.Crim.App. 2004)

150 S.W.3d 169, 171 [inmate pleaded guilty to weapons charge for possessing sharpened toothbrush].)[20]

Defendant would distinguish prior cases involving prison-made weapons as involving knives, shanks, razor blades, and the like, but his real complaint appears to be that to date no California case has held definitively that an inmate's possession of a sharpened plastic toothbrush alone, with no addition or modification made of metal, qualifies under section 190.3, factor (b) as "criminal activity . . . which involved the use or attempted use of force or violence or the . . . implied threat to use force or violence."[21] To quote the late Justice Robert Gardner of the Court of Appeal, "There is now." (*People v. Lopez* (1981) 116 Cal.App.3d 882, 888 [172 Cal.Rptr. 374].)

### 4. *Alleged Prosecutorial Misconduct*

During his closing penalty phase argument, the prosecutor mentioned the evidence showing that shortly after the crimes defendant took a trip with John Selby and his girlfriend to San Francisco to go drinking. Defendant contends this argument was improper because it was relevant only as to whether he was remorseful; because he did not testify at the penalty phase and express remorse, the evidence was inadmissible to show he lacked remorse. He did not object to the prosecutor's argument on that ground, however, so the issue was forfeited for appeal. (*People v. Gray* (2005) 37 Cal.4th 168, 215 [33 Cal.Rptr.3d 451, 118 P.3d 496].) His argument fails in any event. The prosecutor's argument, placed in context, was not addressed to defendant's lack of remorse but was made to rebut any suggestion that his alcohol consumption excused, explained, or mitigated his crimes. Thus, even assuming the issue was properly preserved, the prosecutor's comment was not misconduct.

### 5. *Alleged Instructional Errors*

Defendant contends several aspects of the penalty phase instructions were flawed and infringed on his constitutional rights. He also contends the trial court erred in denying certain requests for alterations or additions to the instructions. As he recognizes, we have rejected these claims in prior cases.

---

[20] Defendant also notes the trial court, in denying his automatic motion for modification, observed that the evidence of items found in his cell did not "constitute[] a section 190.3[, factor] (b) crime" because the use or threat to use force was "too attenuated." In context, we assume the trial court merely meant to say the evidence was not particularly aggravating and thus not entitled to much weight. Although we conclude the evidence was admissible under section 190.3, factor (b), its weight, of course, was for the jury to determine.

[21] But see *People v. Hughes* (2002) 27 Cal.4th 287, 382 [116 Cal.Rptr.2d 401, 39 P.3d 432], where an expert witness testified that inmates have been " 'pretty creative' " in fashioning weapons, specifically mentioning making weapons from toothbrushes.

### a. *Failure to delete inapplicable factors*

Defendant first contends the trial court erred in denying his motion to delete from the penalty phase instructions those statutory mitigating factors that were inapplicable to the case. As he recognizes, we have often rejected this argument. (E.g., *People v. Gray, supra,* 37 Cal.4th at p. 236.) Although he argues we should reconsider our views because of the possibility the jury simply counted up the factors for and against the death penalty, thereby giving unjustified weight to inapplicable factors, we consider this possibility highly unlikely, for the jury, as is often done in capital cases, was instructed that any one mitigating factor could support a decision that death is an inappropriate penalty, and any mitigating factor could outweigh all the aggravating ones. There was thus no danger the jury simply added up the factors, and we accordingly find no state or federal constitutional error.

### b. *Certain factors are mitigating only*

We similarly reject defendant's claim that the trial court erred by denying his motion to have the jury instructed that some factors can be considered only as mitigating. (*People v. Gray, supra,* 37 Cal.4th at p. 236.) We have rejected this claim many times, and defendant presents no good reason to reconsider our past views on the topic.

### c. *Absence of mitigating factors is not aggravating*

Defendant contends the trial court should have instructed the jury that the absence of a mitigating factor cannot be considered aggravating. This is in fact a correct statement of law. (*People v. Gurule, supra,* 28 Cal.4th at p. 661; *People v. Davenport* (1985) 41 Cal.3d 247, 289–290 [221 Cal.Rptr. 794, 710 P.2d 861].) When defendant proposed this instruction, the prosecutor did not oppose it and the trial court agreed to give it. Defendant, however, did not submit to the court a draft of the instruction with his other requested instructions, nor did counsel make any comment about its omission when the parties discussed the instructions with the trial court. Under the circumstances, defendant must be found to have withdrawn his request for this instruction. In any event, the prosecutor did not argue the absence of a mitigating factor could be considered an aggravating circumstance.

### d. *Failure to strike the word "extreme" from section 190.3, factor (d)*

Defendant next contends the trial court's failure to strike the word "extreme" from section 190.3, factor (d) violated his constitutional rights. We have rejected this argument before and do so again here. (*People v. Hughes,*

*supra*, 27 Cal.4th at p. 404.) Nor could there have been any prejudice. Defendant claims the jury may have believed that any mental disturbance that was not "extreme" could not be considered at all, but the prosecutor argued that anything could be considered in mitigation under section 190.3, factor (k), and defense counsel argued that "You don't have to find he had a mental defect in order to find mitigation." The possibility of prejudice was thus virtually nonexistent.

### 6. Victim Impact Evidence

Defendant raises several challenges to the introduction of victim impact evidence at the penalty phase. This evidence took the form of testimony from three witnesses (Eric Thomas, Rebecca Rommel, and Brandi Farrar); a police videotape of Thomas when he was told of the victim's death; and four photographs of the victim when she was alive, including one as a child. Defendant objected to the photographs as irrelevant and the videotape as both unduly prejudicial and cumulative. The court overruled these objections.

The introduction of victim impact evidence in capital cases does not violate any rights guaranteed by the United States Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*).) In *Payne*, the United States Supreme Court explained that " '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Id.* at p. 825.) "We have followed the high court's lead [citation] and have also found such victim impact evidence admissible as a circumstance of the crime pursuant to section 190.3, factor (a) [citation]." (*People v. Boyette, supra*, 29 Cal.4th at p. 444.)

Although defendant acknowledges the precedential force of *Payne*, he argues the prosecution's evidence in this case fell outside the rule established in that case. Relying on Justice O'Connor's concurring opinion in *Payne*, which mentioned the brevity of the victim impact evidence in that case, defendant argues the evidence admitted against him was so extensive and shockingly emotional in nature that its presentation was neither authorized by *Payne* nor consistent with his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We reject the claim. While Justice O'Connor admittedly observed in her separate opinion that the testimony at issue was "brief" (*Payne, supra*, 501 U.S. at p. 831 (conc. opn. of O'Connor, J.)), the *Payne* majority did not establish a bright-line rule authorizing victim impact evidence only on the condition that it be brief. In any event, we need not reach that question here because the

evidence defendant now challenges was in fact quite modest. The combined testimony of Eric Thomas (four and one-half pages), Rebecca Rommel (10 pages), and Brandi Farrar (five and one-half pages) comprised only 20 pages in the reporter's transcript. Moreover, we have reviewed it and conclude it was not unduly emotional.

Defendant next challenges the admission of the videotape showing Thomas as he learned his girlfriend had been killed. Defendant contends the video, "savage in its voyeurism," is irrelevant to the extent of Thomas's loss. Instead, he claims, the video evidence allowed the jury to consider as aggravating evidence Thomas's guilt flowing from the fact he had quarreled with his girlfriend, causing her to leave their car and attempt to walk home. These events, of course, led to her death. We disagree the evidence was irrelevant and instead find the videotape fell within the scope of permissible victim impact evidence because it showed the impact of the crime on one of the principal survivors. Defendant's further claim that admission of the videotape was improper because it deprived him of his right to cross-examine the witnesses against him is forfeited for lack of a specific objection. It is also baseless, for Thomas testified and defense counsel expressly declined to cross-examine him.

Defendant next argues the victim impact evidence ran afoul of the rule that such evidence may not "include characterizations or opinions about the crime, the defendant, or the appropriate punishment, by the victims' family members or friends . . . ." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353].) He points to testimony by Rommel and Thomas to the effect that they could not achieve emotional closure until the trial was over,[22] arguing these witnesses suggested defendant should get the death penalty so they could obtain closure. Defendant did not object on this ground and thus forfeited the claim. Because any implication in this testimony that the survivors wished the jury to impose the death penalty was veiled and obscure, and because the testimony was brief and isolated, it could not have caused any prejudice even were we to assume the claim was preserved and that it was error to admit such testimony.

Defendant also contends that allowing the jury to view the videotape, permitting testimony of the survivors' ongoing trauma and their need for

---

[22] Rommel testified that she recalled the memory of the victim every day and that "[s]he's with me constantly." When asked, "Do you talk about it among the family or is it difficult between—," she replied: "Really I don't think we ever have. I think each one of us has it inside of us and we can't let go of it. *Maybe once this is all behind us we can.*" (Italics added.)

Similarly, the prosecutor asked Thomas: "Is the fact that this case has been going on for this time, is that something that is leaving you in an unresolved situation?" He answered: "It definitely makes it go on longer because *it is something you can't put in the past* because it is going to keep on going on, and it makes it a lot harder, yeah." (Italics added.)

closure, and permitting the quantity of victim impact evidence present in this case all constitute an impermissible and unconstitutional ex post facto enlargement of the scope and meaning of section 190.3, factor (a), which authorizes the jury to consider, in part, "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding . . . ." We disagree. As we recently explained: "*Payne*[, *supra*, 501 U.S. 808,] did no more than remove a judicially created obstacle that had withdrawn a type of evidence that could have proved a material fact. Accordingly, applying the rule in *Payne* in a case where the crime preceded that decision does not violate ex post facto principles." (*People v. Roldan, supra,* 35 Cal.4th at p. 732.)

Finally, defendant contends *Payne, supra,* 501 U.S. 808, authorizes the admission of evidence only of the physical and emotional suffering of a *surviving victim,* apparently suggesting neither Thomas, nor Rommel, nor Brandi Farrar was a "surviving victim." He did not object on this ground and thus failed to preserve the claim for appeal. It is also meritless: "[V]ictim impact testimony is not limited to the victims' relatives or to persons present during the crime . . . ." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

### 7. *Other Constitutional Claims*

Defendant attacks numerous aspects of this state's death penalty law, contending many of its features render it unconstitutional under various amendments to the United States Constitution. In large part he acknowledges we have rejected these claims in the past but contends there is good reason to reconsider our precedents. We disagree and conclude the death penalty law is not unconstitutional:

(a) For failing to adequately narrow the class of persons eligible for the death penalty (*People v. Abilez, supra,* 41 Cal.4th at p. 533);

(b) For failing to require one party to bear the burden of proof (*People v. Abilez, supra,* 41 Cal.4th at p. 533) or failing to inform the jury that no party bore the burden of proof (*People v. Dunkle* (2005) 36 Cal.4th 861, 939 [32 Cal.Rptr.3d 23, 116 P.3d 494]);

(c) For permitting jury consideration of the circumstances of the offense as an aggravating factor under section 190.3, factor (a); specifically, we reject the assertion that factor (a) is so vague and arbitrary that it leads to the wanton or freakish application of the death penalty in violation of the Eighth Amendment to the United States Constitution (*People v. Hovarter, supra,* 44 Cal.4th at p. 1029);

(d) For permitting, under section 190.3, factor (a), jury consideration of a number of aspects of the killing (see generally *Tuilaepa v. California* (1994) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630] [upholding the constitutionality of § 190.3, factor (a)]; see also *People v. Smith, supra*, 35 Cal.4th at p. 352 [consideration of the method of killing is permissible under § 190.3, factor (a)]; *People v. Osband* (1996) 13 Cal.4th 622, 708 [55 Cal.Rptr.2d 26, 919 P.2d 640] [consideration of motive is permissible under § 190.3, factor (a)]);

(e) For permitting consideration of defendant's age (§ 190.3, factor (i); *Tuilaepa v. California, supra*, 512 U.S. 967 [consideration of age is not unconstitutional]; *People v. Smithey* (1999) 20 Cal.4th 936, 1005 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [same]);

(f) For failing to require the jury to provide written findings (*People v. Abilez, supra*, 41 Cal.4th at p. 533);

(g) For failing to require that the jury be unanimous in finding the existence of an aggravating factor, that the aggravating circumstances outweigh the mitigating ones, or that death is the appropriate penalty (*People v. Brasure* (2008) 42 Cal.4th 1037, 1067 [71 Cal.Rptr.3d 675, 175 P.3d 632]);

(h) For failing to require intercase proportionality (*People v. Brasure, supra*, 42 Cal.4th at p. 1068);

(i) For failing to require that penalty findings be made beyond a reasonable doubt (*People v. Abilez, supra*, 41 Cal.4th at p. 533), nor is this conclusion called into question by the high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (*Abilez*, at p. 535);

(j) For failing to require penalty findings to be made by at least a preponderance of the evidence (*People v. Stevens* (2007) 41 Cal.4th 182, 212 [59 Cal.Rptr.3d 196, 158 P.3d 763]);

(k) For permitting consideration of unadjudicated criminal activity under section 190.3, factor (b) (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229]), nor is this conclusion called into question by the high court's decisions in *Apprendi v. New Jersey, supra*, 530 U.S. 466, *Ring v. Arizona, supra*, 536 U.S. 584, or *Blakely v. Washington, supra*, 542 U.S. 296 (*People v. Ward, supra*, 36 Cal.4th at pp. 221–222);

(*l*) For violating principles of constitutional equal protection by treating capital and noncapital defendants differently (*People v. Hovarter, supra*, 44 Cal.4th at p. 1030); or

(m) For violating international norms of the Western world, whether or not the death penalty is characterized as a regular or an extraordinary punishment (*People v. Hovarter, supra*, 44 Cal.4th at p. 1029).

### III. CONCLUSION

The guilt and penalty phase judgments are affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied May 12, 2010.