Filed 8/26/13  P. v. Lopez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAIME JEZZUEL LOPEZ,<br><br>    Defendant and Appellant. | G046477<br><br>(Super. Ct. No. 08NF3673)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard F. Toohey, Judge.  Affirmed.

Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Christopher Beesley and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Jaime Jezzuel Lopez of first degree murder and found true the special circumstance he committed the murder during a robbery. The court sentenced defendant to life in prison without the possibility of parole.

Defendant contends the court erred by excluding evidence he was deported to Mexico six weeks after the murder and voluntarily returned to the United States sometime later. He also alleges the court erred by misreading an instruction to the jury. We affirm the judgment.

FACTS

In 2001, police officers observed the victim, Reginold Harry, in an area where homosexual men would meet to commit lewd acts.[1] Reginold told the officers he was bisexual. In 2004, police officers observed Reginold in a different meeting area for homosexual men.

In 2003, police officers observed defendant in an area where homosexual men would meet to commit lewd acts. Defendant told an officer he was homosexual. In 2006, defendant was parked at the A to Z adult bookstore in Garden Grove (a meeting area for homosexual men) and told an officer that he was waiting for a male prostitute to approach him.

In June 2007, Reginold lived with his wife of 16 years, Annie, and their two sons in a one-bedroom apartment in Fullerton, California. The whole family slept in the apartment's single bedroom, with Annie sharing a large bed with their younger son, while Reginold and the older son slept on a bunk bed's bottom and top bunks, respectively. At the time, Reginold and Annie had not had marital relations for a year and a half or more.

---

[1] To avoid confusion, we refer to Reginold and Annie Harry by their first names. We mean no disrespect.

2

Annie worked as a dietician assistant at a local hospital, and had previously been trained and worked as a nurse in other countries. Annie would leave the apartment at 6:00 a.m. because she worked from 6:30 a.m. to 1:00 p.m. at the hospital. Reginold worked at night doing data entry at a laboratory, usually from 9:00 p.m. to 5:00 a.m. Their older son was a high school sophomore and their younger son was in elementary school.

The morning of June 4, 2007, Annie woke up at 4:45 a.m. The apartment was tidy, as Annie always maintained a very tidy home. Reginold and the two sons were sleeping when Annie left for work at 5:45 a.m. Shortly before 7:00 a.m., the older son left to walk to school. The apartment was still clean and tidy. Between 7:30 and 7:45 a.m., Annie phoned Reginold to ask whether their younger son was going to school even though his legs had hurt the day before. Reginold said their younger son was going to school and was fine. Reginold drove the boy to school. Before dropping his son off, Reginold said, "Bye, [son], I love you."

At about 1:15 p.m., Annie arrived home from work and parked downstairs in front of her apartment. She looked up at her second floor apartment and was surprised to see the curtains drawn on the bedroom and living room windows, which was unusual. Annie walked upstairs and opened the apartment's front door. Strewn on the floor were the contents of a living room cabinet and the cabinet under the kitchen sink. The cabinet doors were open.

Annie called out, "Reggie? Reggie?" Hearing no answer, she rushed to the bedroom. The bedroom door was locked; normally, it was never even closed. A computer on a nearby desk was turned over. Annie knocked on the bedroom door and called, "Open the door, Reggie." Hearing no answer, she phoned the building manager and asked for someone to come open the door. She grabbed a screwdriver and tried to remove the door knob, but the knob fell inside while the latch stayed closed.

3

The apartment building's repairman arrived. Annie seemed very nervous and asked him to quickly open the door. The repairman disengaged the latch and opened the bedroom door.

Annie rushed inside the bedroom. The room was dark because the curtain was drawn. Dresser drawers were open. Items were scattered on the floor. The closet door was slid partially open.

Annie rushed to the bed and saw a naked Reginold laying down on his stomach. The white satin bedspread was red with blood. Annie shook Reginold hard and screamed, "Reggie, get up. Reggie, talk to me." She checked his neck for a pulse but there was none. One side of his head had no hair and was totally white. Annie saw something on one side of the bed, touched it, and realized it was a patch of skin and hair.

The repairman was leaving the apartment when he heard Annie yelling, followed by a high-pitched shrill scream. He returned to the bedroom to ensure she was safe. He saw a body on the bed. After confirming that Annie had phoned 911, the repairman went to the manager's office to report the incident.

The police arrived within 10 minutes and found no signs of a forced entry into the ransacked apartment.

On the lower bunk bed were a box of condoms, a bottle of lubricant, and a black belt. Underneath the mattress were two heterosexual pornographic DVD's. Two pools of blood had seeped through a number of comforters and sheets onto the mattress. On a dresser drawer at the head of the bed was a blood swipe (where an object with blood is rubbed against another object and transfers blood onto it). There was blood cast-off (which occurs when a bloody is moved and the blood is cast off in a blood stain pattern) throughout the bedroom — on virtually every wall, the ceiling, the bedspread, the pillows, a dresser, the blinds, the closet doors, a crucifix, and a picture of Mahatma Gandhi. The blood cast-off on the wall behind the bed and the window area was consistent with the perpetrator being behind the victim on the bed and hitting with the left

4

or right hand and then pulling back and hitting again a number of times. There was blood spatter (which occurs when an object makes contact with blood causing the blood to splash off onto an area) on a bedroom wall and a pillow. Three of Annie's purses were on the bed, instead of in their normal place in a closet. The purses on the bed next to the blood-spattered pillow had no blood on them.

A DNA sample was taken from a drinking glass in the bedroom. The DNA swab was properly maintained and kept at the crime lab and the chain of custody was maintained throughout the testing process.

Annie normally kept a black jewelry case and two plastic boxes of jewelry in a bedroom closet. Now all of her 22 karat gold jewelry was gone, along with $700 to $800 in cash and a bag containing her video camera and all the cassettes recording memories dating from her sons' birth up to that day. Also missing were surgical gloves and a roll of trash bags from the kitchen, Reginold's wallet, and a crystal cross that had been on a nightstand at the foot of the bed.

Annie later gave the police an identical crucifix that belonged to her sister. Annie found a homosexual men's magazine and a men's workout magazine underneath the carpet in the trunk of Reginold's car, which she gave the police. She gave them a bank statement showing a May 21, 2007 withdrawal for $22 from an automatic teller machine at the A to Z Bookstore in Garden Grove. At police request, a flyer was posted at the A to Z Bookstore with Reginold's photo and a synopsis of the incident.

Reginold's autopsy revealed he had suffered 13 lacerations to the left side and back of his head. Beneath the lacerations, hemorrhaging had occurred and the temporal bone was fractured down to the base of his skull. The injuries to Reginold's skull were consistent with his having been struck several times with the edges of the crystal cross, which weighed about three pounds. Reginold also had superficial injuries to his left shoulder and upper back, as well as defensive wounds on his right hand. There

5

was no evidence of sexual trauma to his anus. His death was caused by severe blunt force head trauma.

Almost six weeks later, on July 16, 2007, officers arrived at a home on Donna Lane in Garden Grove in response to a report of a disturbance. The home was located 10 miles from the Harrys' apartment in Fullerton and 4.6 miles from the A to Z Bookstore in Garden Grove.

The homeowner, Eladio Alvarez, told an officer that defendant rented a studio/garage in the backyard. Defendant lived there with his friend, an Asian man. Defendant never paid the $600 rent during the three months he was there because he said he was unemployed. Most of the backyard was off limits to defendant and his friend because defendant was not paying his rent.

Alvarez had told his daughter to phone the police because defendant was arguing with his friend. Alvarez had told defendant he was going to call the police. Prior to the police arriving, defendant asked Alvarez if he (defendant) could leave some items at the house but Alvarez refused. About five minutes before the officers arrived, Alvarez's daughter saw defendant going back and forth from the studio/garage to the back of a shed in the backyard; she thought this was unusual because defendant was not allowed to go there.

Defendant told the police that he was in a relationship with Trung Pham, they lived together at the studio, and they had recently broken up. After talking with defendant about the dispute, an officer told defendant to leave the Alvarez residence.

The next day, Alvarez was doing yard work in the backyard when he found two backpacks behind a storage shed. Alvarez had previously seen defendant and Pham with the backpacks. Alvarez called the police. The responding officer saw a box of latex gloves on top of one blue backpack. Inside the backpack was a large black plastic Samsonite case filled with jewelry. Inside the other backpack was a laptop computer, computer equipment, a Sprint pocket personal computer, jewelry inside some small bags,

6

a letter addressed to defendant, a driver's license renewal application for Pham, and a 2004 tax return for a woman who did not know either defendant or Pham. The jewelry and watches were eventually sent to an auction company to be sold pursuant to police policy, because they had not been claimed. The auction company inventoried the items and took photographs of the jewelry and watches.

Defendant's DNA standard was properly maintained and kept at the crime lab and the chain of custody was maintained throughout the testing process. DNA testing revealed defendant was the major contributor of DNA on the drinking glass found in the bedroom on the day of Reginold's murder. In July 2008, the lead investigator in the murder case was informed of the DNA match.

In August 2008, Annie went to the police station to look at photographs to see if any of the jewelry taken from her home in 2007 was depicted in those photographs. She identified three pieces of jewelry as definitely belonging to her and a watch as resembling one of hers, although she could not definitively identify it as hers without seeing the watch.

*Defense*

Defendant testified in his own defense as follows. He had been to the Fullerton apartment just once. He went there with his friend and drug dealer, Ivan Argueta. Prior to June 2007, Argueta had sold defendant crystal methamphetamine more than 20 times. At that time, defendant had been using methamphetamine for about two years. Defendant and Argueta are both homosexual, and they attended gay clubs together.

On the day in question, Argueta came to defendant's home unannounced, woke him up, and asked defendant to help Argueta move out of his boyfriend's apartment because Argueta and his boyfriend had had a fight. Argueta was high and freaking out. Argueta drove defendant to the apartment in Argueta's white Mustang. Argueta opened

the door to the apartment and defendant followed him inside. Drawers were open and stuff was on the floor. Argueta told defendant to stay in the living room; defendant sat down on the couch. Argueta "went somewhere inside." Defendant heard Argueta moving around in the other room. Defendant shouted to Argueta in the other room, asking what he was doing, what was all this mess, and where was the bathroom. Defendant could not recall what Argueta was saying; Argueta "was just screaming." Defendant used the bathroom and then returned to the living room. He went to the kitchen, got a glass and some water from the sink, drank the water, and put the glass down on the kitchen counter. He did not go into the bedroom or place the glass on any bedroom furniture. Defendant started "freaking out about the place being a mess." It bothered him that Argueta was getting back at his boyfriend by making such a mess. He told Argueta that he wanted to leave. Argueta told defendant to take three pieces of luggage away in Argueta's car. Defendant said he was not coming back for Argueta. Argueta said, "Just take my car, don't worry." Argueta stayed at the apartment. Defendant drove home, left the luggage in the Mustang, and went inside to sleep. Sometime that afternoon, Argueta came and woke defendant up. Argueta asked defendant for the car keys. Argueta then left.

That evening, Argueta returned and gave defendant two plastic grocery bags containing about 12 pieces of jewelry. Defendant and Argueta talked about money that Argueta had borrowed from defendant. (Defendant had pawned a computer and printer to get the money to lend to Argueta). Argueta left and defendant never saw him again.

On the day defendant fought with Pham, defendant hid the backpacks behind the storage shed because he and Pham had stuff in there they did not want the police to find. They had been committing credit card fraud and identity theft by stealing mail from mailboxes. Pham's cell phone, iPod, and defendant's computer were in one

8

backpack. Defendant subsequently went to the police department to ask that his property be returned, but was told it had either been donated to charity or sold.

Defendant admitted that in 2008 he was convicted of felony fraud in Orange County. In October 2008, a police detective showed defendant a photograph of the Harry apartment. Defendant denied having been there because at "that point in time [he] didn't recognize the place." When defendant was shown a photograph of Reginold, defendant first said he did not recognize that person. Defendant later told the detectives that he recognized Reginold from a flyer he saw at the A to Z Bookstore.

The defense also called a police detective as a witness. The detective testified that he interviewed defendant in October 2008 regarding the June 2007 incident at the Fullerton apartment. Defendant told the detective that it had been about four to five years since he had been in Fullerton. The detective showed defendant a photograph of the Fullerton apartment and mentioned there was scientific evidence linking him to the location. Eventually defendant admitted he was there and gave the version of events involving Argueta. Defendant told the detective that when he was in the apartment, he went to the kitchen, filled up a glass of water, and drank some. At that time, the detective had not told defendant that his DNA was found on a drinking glass in the apartment.

The detective found a July 20, 2007 traffic citation in which Argueta had provided a Fullerton address to a police officer. The address was located two to three miles from the Harrys' Fullerton apartment. The detective verified that Argueta did indeed own a white Mustang and located him in Mexico. A Spanish-speaking officer interviewed Argueta in Mexico and obtained samples of Argueta's hair and saliva. Tests showed that Argueta's DNA was not present in the Fullerton apartment.

9

*The Court Did Not Abuse Its Discretion by Excluding Evidence of Defendant's Deportation to Mexico and His Return to the United States*

Defendant contends the court erred by excluding evidence of his deportation in July 2007, his subsequent return to southern California, and his attempt to retrieve his property from the police department. He argues his "overall course of conduct and the particular incident in which he made an affirmative contact with local police was *consistent* with his innocence of the murder and *inconsistent* with a consciousness of guilt or knowledge of the murder."

Outside the jury's presence, before the People called their last witness, the court and counsel discussed on the record defendant's immigration status and deportation to Mexico. The prosecutor specifically requested that the evidence be excluded. Defense counsel noted that the jury had not heard, but the court was aware, that defendant was arrested on July 16, 2007 (the day of the domestic violence incident on Donna Lane), served jail time, was deported, and then came back into the United States. Defense counsel argued that evidence of defendant's deportation to Mexico and return to the United States would help show his innocence since he could have stayed in Mexico. The prosecutor argued defendant could have many unknown reasons for returning to the United States, the evidence lacked foundation as to his innocence, and evidence of his immigration status could potentially prejudice the People.

The court asked whether there was any other relevant information about the time period after defendant returned to the United States. Defense counsel replied that, after defendant returned to this country, he went to the police department to claim his seized property but was told it was gone. Defense counsel stated, however, this had "nothing to do with the deportation angle." The prosecutor mentioned defendant committed a series of burglaries after his return to the United States and the People

10

intended to impeach defendant based on his moral turpitude conviction. Defense counsel stated defendant wanted "to explain to the jury his lifestyle and how he was leading his life and his drug habit" subsequent to the homicide, although the attorney himself was not certain the testimony would be relevant.

After the close of the People's case, outside the jury's presence, the court held further proceedings on evidentiary issues. The court exercised its discretion under Evidence Code section 352 to exclude evidence of defendant's multiple convictions of theft. But the court admitted evidence defendant had been convicted of a felony.

The court then asked defense counsel if he had any offer of proof as to the relevance of defendant's deportation and subsequent return to the United States. Defense counsel had no further explanation over and above what he had said earlier about defendant's wishes. The court ruled the evidence of defendant's immigration status and that he was deported and reentered the country was irrelevant. The court added that if, after defendant testified, either side believed such evidence somehow became relevant, the court would be willing to take a second look at it.

Defendant then testified. He did not testify about his deportation from and reentry into the United States. He did, however, testify (over the prosecutor's relevance objection) that he went to the police to ask for the return of the property in the backpacks. He testified the police said the property "was already given to either charity or sold."

After defendant finished testifying and before the next defense witness was called, the court asked outside the jury's presence, whether the attorneys needed to discuss anything about the state of the evidence. Defense counsel replied, "No."

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," and includes evidence relevant to the credibility of a witness or hearsay declarant. (Evid. Code, § 210.) In contrast, evidence need not be material to be admissible (*People v. Lewis* (2009) 172 Cal.App.4th 1426,

11

1441); "[e]vidence is 'material' if there is a reasonable possibility it would make a difference in the outcome" (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2012) ¶ 8:102.1, p. 8B-1 (rev. # 1, 2012)).  The weight of particular evidence is not a factor in determining its relevance for admissibility.  (*People v. Clark* (2011) 52 Cal.4th 856, 923.)  But "'evidence which produces only *speculative* inferences is *irrelevant* evidence.'"  (*People v. Babbitt* (1988) 45 Cal.3d 660, 682.)

"A trial court has broad discretion to determine whether evidence is relevant."  (*People v. Lomax* (2010) 49 Cal.4th 530, 581.)  Accordingly, we review for an abuse of discretion a trial court's rulings on the admissibility of evidence.  *(Id.* at p. 582.)  A judgment may not be reversed due to the erroneous exclusion of evidence unless the error is prejudicial and it appears of record that, subject to exceptions, the "substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means."  (Evid. Code, § 354, subd. (a).)

"Ordinarily a criminal defendant's attempt 'to inflate garden-variety evidentiary questions into constitutional ones [will prove] unpersuasive.  "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.'  [Citations.]  Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense."'"  (*People v. Thornton* (2007) 41 Cal.4th 391, 443.)

Defendant broadly contends that the court excluded any testimony on his part about his deportation, return, and voluntary contact with the police.  Defendant particularly stresses the significance of this last circumstance; he argues that his visit to the police station to claim his property "was particularly probative of an innocent state of mind because [the action] was highly unlikely behavior for someone trying to avoid

12

arrest for murder." But defendant did in fact testify to this conduct. The court overruled the prosecutor's relevance objection and allowed defendant to testify that he asked the police to return his property, but the police stated the property had been donated to charity or sold. The only information missing from the testimony was the exact timing of his visit to the police station, i.e., that it took place after he voluntarily returned to the United States from Mexico. Nonetheless, the jury would have necessarily inferred that defendant asked the police to return the property sometime *after* the police confiscated the backpacks in the first place and therefore sometime *after* Reginold's murder. In other words, the jury heard evidence from which it could have inferred (but obviously did not) that defendant went to the police station with an innocent state of mind.

We conclude the court did not abuse its discretion by excluding as irrelevant the proffered evidence that defendant was deported to Mexico and returned voluntarily to the United States and that his effort to regain his property took place after his return to this country. The court was well within its discretion to find that any inference of defendant's innocence, based on this evidence, would be purely speculative.

*There was No Reversible Instructional Error*

The court provided the jury with a written instruction on felony murder which stated, inter alia: "The defendant must have intended to commit the felony of robbery before or at the time he caused the death." But the court, in reading the instruction to the jury, erroneously substituted the word "murder" for "robbery," saying, "The defendant must have intended to commit the felony of murder before or at the time that he caused the death." The court also instructed the jury, "I will give you a copy of the instructions to use in the jury room. . . . Only consider the final version of the instructions in your deliberations."

In *People v. Mills* (2010) 48 Cal.4th 158, 200, the trial court misread an instruction to the jury by erroneously adding the word "not" twice. By doing so, the

13

court "told the jury the opposite of the correct definition." (*Ibid.*) Our Supreme Court held the trial court committed no reversible error. (*Ibid.*) "The risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke. 'We of course presume "that jurors understand and follow the court's instructions." [Citation.] This presumption includes the written instructions. [Citation.] To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' [Citation.] Because the jury was given the correctly worded instructions in written form and instructed with CALJIC No. 17.45 that '[y]ou are to be governed only by the instruction in its final wording,' and because on appeal we give precedence to the written instructions, we find no reversible error." (*Id.* at pp. 200-201, fn. omitted.)

*Mills* is controlling here. There was no error.

DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.

14